11-762-cv
Rivera v. Rochester Genesee Regional Transportation Authority

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**


August Term, 2011

(Submitted: March 1, 2012          Decided: December 21, 2012

Amended: February 10, 2014)

Docket No. 11-762-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ENIO R. RIVERA,
MICHAEL TALTON,

Plaintiffs-Appellants,

v.

ROCHESTER GENESEE REGIONAL TRANSPORTATION AUTHORITY,

Defendant-Appellee,

JOHN TIBERIO,

Defendant.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

[1]  For the reasons stated in the opinion, see footnote 2, the Clerk of Court is directed to amend the official caption to conform with the above.

Before: KEARSE, LOHIER, and DRONEY, Circuit Judges.

Enio Rivera and Michael Talton, employees of the Rochester Genesee Regional Transportation Authority ("RGRTA"), sued that agency, alleging that they were subjected to a hostile work environment on the basis of race and national origin and were retaliated against for complaining about the hostile work environment. The District Court granted summary judgment to RGRTA on all claims. Because we conclude that genuine issues of material fact exist as to plaintiff-appellant Rivera's hostile work environment claims against RGRTA and as to all of plaintiff-appellant Talton's claims against RGRTA, we VACATE in part the grant of summary judgment and REMAND to the District Court for further proceedings as to these claims. However, we AFFIRM the judgment of the District Court as to plaintiff-appellant Rivera's claims of retaliation.

CHRISTINA A. AGOLA, Christina A. Agola, PLLC, Rochester, NY, for Plaintiffs-Appellants.

SCOTT D. PIPER, Harris Beach PLLC, Pittsford, NY, for Defendant-Appellee.

LOHIER, Circuit Judge:

Plaintiffs Enio Rivera and Michael Talton, employees of Lift Line, Inc., a subsidiary of Rochester Genesee Regional Transportation Authority ("RGRTA"), appeal from a judgment of the United States District Court for the Western District of New York (Larimer, J.), granting the summary judgment motion of RGRTA and dismissing the plaintiffs' claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. § 1981, and the New York State Human Rights Law ("NYSHRL"). RGRTA is the only defendant against which this appeal was taken.[2] On appeal,

---

[2] Rivera and Talton also pursued discrimination and retaliation claims against John Tiberio, a supervisory employee, and Talton alleged causes of action for violations of, and retaliation under, the Family Medical Leave Act, 29 U.S.C.

2

Rivera, who is of Puerto Rican descent, and Talton, an African American, contend that they proffered sufficient evidence that they were subjected to a hostile work environment based on national origin and race, respectively, and thereafter were retaliated against for complaining about it.[3]  For the reasons that follow, we affirm the judgment of the District Court as to Rivera's retaliation claims, but vacate the judgment of the District Court as to plaintiffs' remaining claims against RGRTA and remand to the District Court for further proceedings.

**BACKGROUND**

In reviewing the District Court's grant of summary judgment in favor of RGRTA, "we construe the evidence in the light most favorable to the plaintiff[s], drawing all reasonable inferences and resolving all ambiguities in [their] favor."

---

§ 2601 et seq.  Those claims are not pursued in this appeal.  In the opinion issued on December 21, 2012, we directed the Clerk of Court to amend the caption to designate John Tiberio as a defendant-appellee.  Shortly thereafter, Tiberio filed a motion to recall the mandate and amend the decision by removing him from the caption.  In an order issued on June 13, 2013, we recalled the mandate, but reserved decision with respect to the motion to amend, instead remanding the case to the District Court to make factual findings to aid us in resolving the motion.  On November 8, 2013, the District Court issued a decision and order answering the questions posed by this Court.  After reviewing submissions from plaintiffs-appellants and Tiberio, and in light of the District Court's findings with respect to Tiberio's representation, plaintiffs-appellants' failure to serve any papers on Tiberio's counsel, and plaintiffs-appellants' designation of Tiberio as a "defendant," not as a "defendant-appellee," in its papers on appeal, we grant Tiberio's motion to amend the caption.  See Fed. R. App. P. 25(b); cf. Garner v. Cuyahoga Cnty. Juvenile Court, 554 F.3d 624, 644-45 (6th Cir. 2009); Brookens v. White, 795 F.2d 178, 181 (D.C. Cir. 1986).

[3]  Although Rivera purported to state a claim for discrimination on account of his "race   . . . and national origin," all of his factual allegations concerned discrimination on the basis of his Puerto Rican national origin.

3

In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 504 (2d Cir. 2010) (quotation marks omitted).

### 1. Rivera

Lift Line is an RGRTA subsidiary that provides door-to-door public transportation services for elderly and disabled persons. Rivera, a Hispanic of Puerto Rican descent, started working for Lift Line as a bus driver in 1994 and remained in that position at all relevant times. Sometime in 2001, Dominic Folino, the senior mechanic at Lift Line, began an affair with Rivera's then-wife, Kimberly. Kimberly and Rivera divorced in 2002 or 2003, after Rivera learned about the affair, and Kimberly married Folino. Rivera also remarried, in 2006. Other than a brief period in 2006, Rivera's son lived with Folino and Kimberly from 2002 onward. The affair predictably ignited a deep personal conflict between Rivera and Folino at work.

As relevant to his claims of discrimination, Rivera testified that between 2003 and 2007 Folino called him a "spic" twice and a "Taco Bell" at least five times. Rivera testified that there were several occasions on which he pulled into the Lift Line garage to find Folino and Tim Driscoll, another Lift Line mechanic, chanting "What's that smell, look at the fat f***, there is Taco Bell." During his deposition, Talton confirmed that Folino openly referred to Rivera as a "spic" and a "nigger spic" outside of Rivera's presence on at least one occasion. Talton further testified that Folino "looked at me and he said, 'Mike, I'm not talking about you. A nigger can mean anybody. I'm talking about that spic, Ralph Rivera.'"

Rivera also presented extensive contemporaneous evidence suggesting that Folino and several other Lift Line mechanics regularly harassed and bullied him throughout this period, but without using ethnic slurs. Rivera reported many of

4

these instances of harassment to RGRTA shortly after they occurred. For example, on April 23, 2003, Rivera filed an "Incident Report" in which he asserted that mechanic John Stiggins and another employee stopped and confronted him as he was driving out of the Lift Line parking lot after work. In May 2003 he followed up with a letter to Lift Line's Human Resources Department, claiming that Folino and another mechanic had cursed and stared at him menacingly. In another letter four months later, Rivera complained that Folino had cursed at him again and tampered with his time card slot. Rivera also alleged that Lift Line had ignored his complaints of harassment. None of these 2003 complaints referred to the use of ethnic slurs or harassment motivated by Rivera's national origin.

The following year, in June 2004, Folino filed an internal complaint of his own, claiming that Rivera had threatened him. In September 2004 Robert Bilsky, Lift Line's Vice President for Human Resources, informed Rivera that he had become aware of conflicts between Rivera and Folino due to "problems in [their] personal home lives." Bilsky said that he could "find no proof of exactly who is right or wrong in this harassment complaint," but that he was "extremely concerned" about the ongoing hostility between Folino and Rivera.

Although a change in shift times in late 2004 apparently reduced the frequency of interactions between Rivera and Folino at work, the conflicts between the two men resumed in 2005. Between March 2005 and September 2007, Rivera filed seven complaints about Folino's conduct, again accusing Folino of threatening and harassing him. For example, Rivera claimed that Folino sprayed Rivera with paint thinner, posted photos in the workplace of lavish gifts he had purchased for Rivera's son, stared menacingly at Rivera, swerved his car toward Rivera in the parking lot, and generally undermined Rivera's ability to do

his job. Rivera's internal complaints employed the terms "prejudice," "harassment," and "discrimination," but they did not mention or suggest that Folino's conduct involved ethnic slurs or was otherwise on account of Rivera's national origin. In his September 2005 complaint, Rivera attributed Folino's behavior to their personal conflict, asserting that Folino "insist[ed] to bring these very personal issues to work . . . causing a very uncomfortable and hostile work environment." Talton testified, however, that it was during this time period that Folino referred to Rivera as a "spic" and "nigger spic."

Rivera first formally accused Folino of harassment on account of national origin in March 2007, when he filed a complaint with the New York State Division of Human Rights ("NYSDHR"). The NYSDHR complaint attributed the harassment to "an old boys club, specifically of Italian American descent that have a conspiracy against me and are trying to have me fired from Lift Line." As with Rivera's earlier internal complaints, the complaint alleged that Folino, Stiggins, a supervisor, John Tiberio, and others had engaged in boorish or harassing behavior directed at Rivera, but failed to mention the use of ethnic slurs by any of his co-workers.

NYSDHR notified Lift Line of Rivera's complaint by letter dated March 7, 2007. Rivera claims that Lift Line retaliated against him thereafter. He testified that (1) he was disciplined for insubordination twice in approximately 2008 or 2009; (2) Lift Line rejected his request for a half day off for a doctor's appointment, in violation of a collective bargaining agreement; (3) he was assigned particularly "dirty buses" to drive; (4) he once received his overtime pay two weeks late; and (5) after he was involved in a minor driving accident, Folino unsuccessfully urged the Lift Line road supervisor to drug test him, even though company policy did not mandate it.

6

**2. Talton**

Talton was hired by Lift Line in 2004 as a "fueler-washer" responsible for refueling, cleaning, and servicing the buses when the drivers returned from their runs. Talton alleges that co-workers taunted him with racial slurs. During discovery, Talton testified about two specific incidents in which John Stiggins, a white mechanic, called him a "nigger." He also presented evidence that his white supervisor, Tiberio, used the same racial slur.

In the first of two incidents involving Stiggins's conduct on the Lift Line premises, Stiggins told Talton, "I thought you was my boy," and, "You know what I'm talking about, nigger. You were supposed to look out for us." The statement apparently referred to Talton's failure to cover for Stiggins when a Lift Line dispatcher was looking for him. When Talton responded, "Who . . . are you calling nigger?," Stiggins aggressively approached Talton and said "We could do this right here." In the second incident, Talton and Stiggins were talking casually when Stiggins abruptly announced that he had been "out drinking with Mingo [Sanhueza, a co-worker] last night" and that Sanhueza had "started talking about niggers." Stiggins claimed that Sanhueza had said that he "wished all you niggers died."

Talton further testified that his supervisor, Tiberio, called him a "nigger," and also told him to "[g]et over it" when he complained that his co-workers had used the slur. This testimony is consistent with a charge that Talton filed with the Equal Employment Opportunity Commission ("EEOC") in May 2006, which asserted that his supervisor — presumably Tiberio — responded to Talton's complaint about racial harassment by laughing and then telling Talton that he "should just 'suck it up and get over it, nigger!'" In support of the defendant's summary judgment motion, Tiberio submitted an affidavit in which he denied

7

that he ever used that or any other racial slur and similarly denied that Talton complained to him about racial harassment.

Talton also claims that he was racially harassed after he told Lift Line's management that Sanhueza, a bus driver, kept a gun on one of the buses. After discovering the gun while cleaning the bus, Talton immediately called Tiberio, who retrieved the gun and started an investigation. Upset by the disciplinary hearing that followed, Sanhueza threatened Talton by shaping his hand in the form of a gun and saying, "I'm going to kick your ass, nigger." Sanhueza was initially terminated as a result of the gun incident. In September 2005, however, Sanhueza's union settled with RGRTA, and Sanhueza was reinstated as a fueler-washer rather than a driver. Somewhat ironically, Talton was made responsible for training Sanhueza in his new position. In October 2005 Talton, Tiberio, and Sanhueza met to discuss the fact that some of the buses were not adequately cleaned. After the meeting, according to Talton, Sanhueza threatened Talton and again called him a "nigger." Talton complained to Tiberio, who sought disciplinary action, and Sanhueza was permanently terminated sometime, it appears, in autumn 2005.

In May 2006 Talton filed his first charge of discrimination with the EEOC. The charge primarily recounted his encounters with Sanhueza, but also reported that other co-workers — including Tiberio, as described above — had called Talton a "nigger." In both his EEOC charge and in his deposition during discovery in this case, Talton asserted that he had complained in hand-delivered letters to management about the incidents described above, but that Lift Line had failed to take remedial action.

After the initial May 2006 charge, Talton filed two more EEOC charges of discrimination. The first of these charges, filed in August 2006, alleged that

Tiberio warned Talton that he could lose his job for filing the initial EEOC charge. The last EEOC charge was precipitated by internal complaints against Talton that were filed by Stiggins and Edwin Ayala, a fueler-washer, claiming that Talton had made various menacing comments and "false accusations" in the workplace. Their complaints quickly culminated in Talton meeting with RGRTA's Vice President of Regional Operations, Debie Himmelsbach, who told Talton that she had "received reports from several employees . . . regarding behavior he had exhibited which made them uncomfortable" and that he "needed to be more careful in his relationships with other employees." Talton charged that this counseling meeting with Himmelsbach was held in retaliation for his first two EEOC charges.

Talton also points to at least four other acts of retaliation, not all of which were described in his EEOC charges. First, he testified that he was disciplined three times for insubordination after filing his EEOC charges. Second, he claims Tiberio distributed copies of at least one of Talton's EEOC charges to co-workers and directed the other fueler-washers not to interact with him. Third, Talton submitted an affirmation from a co-worker asserting, among other things, that Talton had been forced to clean buses containing blood and vomit after other employees had refused to do so. Fourth, approximately one month after Talton filed his first EEOC charge, an unidentified person called him a "nigger" and threw a brick at him.

### 3. District Court Proceedings

Rivera and Talton jointly filed an amended complaint in May 2008 and, after discovery, RGRTA moved for summary judgment. The District Court granted the motion as to both plaintiffs, concluding that the harassment that Rivera allegedly experienced arose from a personal conflict rather than Rivera's

9

national origin, and that Talton had presented evidence only of "isolated incidents of crude and offensive language taking place over a period of several years." Rivera v. Rochester Genesee Reg'l Transp. Auth., 761 F. Supp. 2d 54, 58 (W.D.N.Y. 2011). After concluding that the plaintiffs could not "establish adverse employment actions, or a causal connection between those actions and their protected activity," the court also dismissed both plaintiffs' retaliation claims. Id.

Both plaintiffs timely appealed.

**DISCUSSION**

**1. Standard of Review**

We review an award of summary judgment de novo. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010). Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, 'there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law,'" McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(c)); see Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007) ("A genuine issue exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.") (quotation marks omitted). Although summary judgment is proper where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005), district courts should not "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment," Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011).

10

## 2. Hostile Work Environment

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Gorzynski, 596 F.3d at 102 (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)).[4] In considering whether a plaintiff has met this burden, courts should "examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003) (quotation marks omitted). Moreover, the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quotation marks omitted). Of course, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic," such as race or national origin. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).

---

[4] The same standards apply to the plaintiffs' hostile environment claims arising under the NYSHRL, see Pucino v. Verizon Comm'cns., Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010), and to their claims arising under 42 U.S.C. § 1981, see Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000).

With these principles in mind, and recognizing that there is no genuine dispute that Rivera and Talton each subjectively perceived his environment to be hostile and abusive, we review the hostile work environment claims of each plaintiff.

### a. Rivera

Rivera presented evidence that Folino, sometimes alone and sometimes with other Lift Line mechanics, harassed him based on his national origin and in a manner that interfered with his ability to do his job. We therefore disagree with the able and experienced District Judge that Rivera did not present any genuine dispute of material fact regarding whether the mistreatment included ethnic slurs or otherwise reflected ethnic animus.

We recognize, however, that this is a close call. From 2003 to 2007, Rivera filed several complaints with RGRTA's Human Resources Department regarding Folino's conduct, none of which referenced Folino's use of ethnic slurs or harassment based on national origin. Indeed, Rivera's testimony that Folino and others chronically directed ethnic slurs at him is somewhat belied by his early assertions that the "hostile work environment" he experienced was a result of his personal conflict with Folino. For example, one of Rivera's complaints explicitly attributed Folino's harassment to their personal conflict, and criticized Folino for "bring[ing] these very personal issues to work . . . causing a very uncomfortable and hostile work environment." Rivera's NYSDHR complaint, which, in contrast to prior complaints, asserted that Folino's conduct constituted national origin discrimination, again made no reference to Folino's use of ethnic slurs or other ethnically based harassment. If the instances of ethnic name-calling were "sufficiently severe or pervasive to alter the conditions of [Rivera's] employment and create an abusive working environment," Gorzynski, 596 F.3d at 102

12

(quotation marks omitted), it is reasonable to expect Rivera to have adverted to them at least once in his lengthy correspondence with RGRTA's Human Resources Department as well as the NYSDHR.

Still, this issue is left for the jury to decide at trial, since Rivera's deposition testimony about Folino's use of ethnic slurs was not conclusory, and a reasonable jury could credit Rivera's testimony on this point, and discount the evidence demonstrating that Folino's harassment was not on account of Rivera's national origin. See Redd v. N.Y. Div. of Parole, 678 F.3d 166, 178 (2d Cir. 2012). We arrive at this conclusion for three reasons.

First, Rivera testified that Folino or Driscoll called him "spic" "probably like three times." Although Rivera was unable to provide information about the specific timing and circumstances of these "spic" slurs, he testified more specifically that Folino and Driscoll together chanted another slur — "What's that smell . . . there is Taco Bell" — at least once after Rivera pulled into a Lift Line garage. Rivera variously testified that he heard the same chant anywhere from "[e]very time" he pulled into the garage to "about five" times. We are obliged to consider the defendants' alleged uses of slurs "cumulatively in order to obtain a realistic view of the work environment," Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 83 (2d Cir. 2009) (quotation marks omitted), and to determine whether they "alter[ed] the conditions of [Rivera's] employment and create[d] an abusive working environment," Gorzynski, 596 F.3d at 102 (quotation marks omitted). Second, Rivera's testimony was corroborated by Talton's deposition testimony, and that of other non-party witnesses who provided evidence about ethnically and racially hostile comments made outside of Rivera's presence, both about Rivera and about Talton. See Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("The district court appears to have reasoned that because only the

13

first four incidents occurred 'in the plaintiff's presence,' only those four are relevant to this action. The district court's failure to consider the totality of the circumstances in this case, including its selective treatment of the evidence in the record, was in error and necessitates reversal." (internal citations omitted)); Perry v. Ethan Allen, Inc., 115 F.3d 143, 150–51 (2d Cir. 1997) ("Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."). Third, in addition to the evidence of the use of ethnic slurs, Rivera offered detailed testimony about extensive bullying and physical harassment by Folino and others that occurred during the relevant period. A reasonable jury could conclude that the alleged incidents of harassment in the record, including the slurs, constituted more than "mere offensive utterance[s]." Hayut, 352 F.3d at 745; see Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) ("Burlington Northern").[5]

Rivera's harassment claim does not present circumstances like those found appropriate for summary judgment in Jeffreys and Rojas. In Jeffreys, for example, we held that summary judgment was proper where the plaintiff's case relied entirely on self-serving testimony and, prior to giving that testimony, the plaintiff made "multiple admissions" that were "inconsistent with his later testimony" and that he "failed to explain away" with "any plausible

---

[5] We caution, however, that "'[t]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.'" Richardson, 180 F.3d at 439 (quoting Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993), abrogated on other grounds by Burlington Northern, 548 U.S. 53).

explanation." 426 F.3d at 555 n.2 (quotation marks omitted). The plaintiff, Percy Jeffreys, brought suit against several police officers who allegedly assaulted him with a flashlight before throwing him out of a third-story window. Jeffreys's account of the incident at his deposition differed on all points from several accounts that Jeffreys gave shortly after the incident happened. On at least three occasions Jeffreys "confessed to having jumped out of the third-story window," and made "no mention of any police misconduct." Id. at 552. Similarly, "[a]t his arraignment, guilty plea, and sentencing, Jeffreys . . . made no mention of any beating or defenestration," id., and medical records also appeared to belie his claim, id. at 552–53. During his deposition testimony, moreover, Jeffreys was unable to provide any specific details about the incident, and the testimony was corroborated only by two family members who submitted affidavits that established, at best, what Jeffreys had told them about the incident sometime after it occurred. Id. at 553. We concluded that "[i]n the circumstances presented in the instant case — where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys'[s] testimony, . . . the District Court did not err by awarding summary judgment." Id. at 555 (alteration in original) (quotation marks omitted); see also Rojas, 660 F.3d at 105 (summary judgment properly granted to defendants where plaintiff "relied almost entirely on her own testimony," which was contradicted by "contemporaneous letters and

15

meeting notes" suggesting that the plaintiff had complained only of "general friction" with her supervisor, as opposed to sexual harassment).[6]

Here, by contrast, Rivera does not allege the occurrence of something that he previously described as not happening. He claimed ethnic discrimination in his 2007 complaint to the administrative agency, as was required for purposes of exhaustion. In his administrative and court assertions he has not been inconsistent in claiming that he was subjected to ethnic slurs. Any variance in those assertions has been in the number of times he was subjected to such slurs. That Rivera did not complain of ethnic slurs to RGRTA may lead a factfinder to find that claim not credible, but there is no real, unequivocal, and inescapable contradiction of the sort we contemplated in Jeffreys and Rojas, and matters of credibility are not to be determined on a motion for summary judgment. In addition, unlike in Jeffreys or Rojas, Rivera's testimony was corroborated by other independent evidence, including the testimony of Talton.

Further, although RGRTA suggests that Rivera lacked detailed direct evidence of a hostile work environment based on his national origin, his testimony and Talton's testimony provided that evidence. We have cautioned that a hostile work environment claim need not be supported by direct evidence of explicit racial harassment. Circumstantial evidence may do. See Raniola v. Bratton, 243 F.3d 610, 621–22 (2d Cir. 2001) (explaining that a hostile work environment plaintiff may prevail by adducing "circumstantial proof that . . . adverse treatment that was not explicitly sex-based was, nevertheless, suffered

---

[6] Cf. Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

16

on account of sex"). Nor was Rivera required to demonstrate that his national origin was the only motivating factor. He needed to show only that "a reasonable fact-finder could conclude that race [or national origin] was a motivating factor in the harassment." See Terry v. Ashcroft, 336 F.3d 128, 150 (2d Cir. 2003) (emphasis added). Here, there was (barely) enough evidence — both the use of of ethnic slurs and the broader bullying and physical harassment — from which a reasonable jury could find that Folino harassed Rivera not merely because of their personal history, but also because Rivera was Puerto Rican. Raniola, 243 F.3d at 622. Considering that evidence, together with the evidence of a racially hostile work environment for Talton, his co-worker, in the light most favorable to Rivera, and resolving all ambiguities in his favor, we conclude that the District Court erred in granting summary judgment to the RGRTA on Rivera's hostile work environment claim.

### b. Talton

Talton gave detailed and uncontradicted testimony indicating both that his supervisor directed the word "nigger" at him, and that co-workers directed the word at him in a physically threatening manner. For example, he specifically recounted that his co-worker, John Stiggins, called him a "nigger" on at least two occasions, and that both times Stiggins threatened him with physical violence, once by saying, "We could do this right here," and another time by referencing a co-worker's statement that he "wished all you niggers died." Similarly, Talton testified that another co-worker, Mingo Sanhueza, called him a "nigger" and threatened him physically by shaping his hand in the form of a gun. In addition, Talton testified that Tiberio, his supervisor, called him a "nigger," and that Tiberio also told him to "get over it" when Talton complained about racial harassment by co-workers. The claim involving Tiberio was consistent with

17

Talton's May 2006 EEOC charge, in which he alleged that Tiberio had responded to his complaints of racial harassment by telling him to "suck it up and get over it, nigger!"

RGRTA contends that Talton's hostile work environment claim was properly dismissed because, among other things, he was unable to provide enough details regarding Tiberio's use of any racial slur. We disagree. Although it is true that Talton could not recall certain details of this incident during his deposition testimony, he provided enough details, which were supported by contemporaneous evidence in the form of an EEOC charge filed against Lift Line. A reasonable factfinder could conclude that Tiberio and other RGRTA employees directed the racial slur at Talton. See Richardson, 180 F.3d at 439–40 (vacating grant of summary judgment where plaintiff presented detailed evidence that her supervisor and several co-workers used racial slurs); cf. Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 893 (8th Cir. 2005) (supervisor's use of racial epithets not sufficient to create racially hostile work environment in violation of Title VII when none of the comments were made directly to African-American employee). We emphasize that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Richardson, 180 F.3d at 439 (quoting Rodgers, 12 F.3d at 675) (quotation marks omitted). The use of racially offensive language is particularly likely to create a hostile work environment when, as here, it is presented in a "physically threatening" manner. Hayut, 352 F.3d at 745.

With that in mind, whether the conduct taken together created a work environment that was sufficiently hostile to violate Title VII is a question of fact for the jury. Redd, 678 F.3d at 178. Taking the evidence in the light most

18

favorable to Talton and accepting his version of the events as true, we conclude that the District Court erred in dismissing Talton's hostile work environment claim against RGRTA.[7]

### 3. **Retaliation Claims**

Rivera and Talton also appeal the District Court's dismissal of their retaliation claims against RGRTA. At the outset, we note that in order to prevail on a retaliation claim, "the plaintiff need not prove that h[is] underlying complaint of discrimination had merit," Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012), but only that it was motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful," Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (quotation marks omitted). The good faith and reasonableness of the plaintiffs' beliefs that they were subjected to discrimination is not an issue on this appeal.

Title VII's antiretaliation provision prohibits an employer from discriminating against an employee for opposing any practice made unlawful by Title VII. Burlington Northern, 548 U.S. at 59–60. To establish a prima facie case of unlawful retaliation under Title VII, "an employee must show that (1) []he was engaged in protected activity; (2) the employer was aware of that activity; (3) the

---

[7] RGRTA also raises in a footnote a perfunctory argument that summary judgment was nevertheless proper because it was entitled to an affirmative defense under Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). RGRTA states that this Court "is free" to "elect[] to engage in the Faragher/Ellerth analysis" in order to uphold the dismissal of the hostile work environment claim on the basis of an affirmative defense under those cases even though the District Court did not reach the issue, pointing out that we may affirm on any ground supported by the record. However, as RGRTA has provided no argument on this appeal as to why it was entitled to prevail on the basis of that defense, we do not reach that issue.

19

employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Lore, 670 F.3d at 157. The requirement of a materially adverse employment action reflects the principle that "Title VII does not protect an employee from 'all retaliation,' but only 'retaliation that produces an injury or harm.'" Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 569 (2d Cir. 2011) (quoting Burlington Northern, 548 U.S. at 67).

In Burlington Northern, the Supreme Court described a "material adverse action" as follows: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68 (citation and quotation marks omitted); see also Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006) (noting that Burlington Northern announced a different standard of material adversity than that previously employed in this Circuit in, for example, Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004)). Still, "[a]ctions that are 'trivial harms' — i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." Tepperwien, 663 F.3d at 568 (quoting Burlington Northern, 548 U.S. at 68).[8]

In reviewing a grant of summary judgment, therefore, we are mindful that material adversity is to be determined objectively, based on the reactions of a reasonable employee. Burlington Northern, 548 U.S. at 69–70. But "'[c]ontext

---

[8] "[R]etaliation claims under the [New York State Human Rights Law] are generally governed by the same standards as federal claims under Title VII." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006).

20

matters,' as some actions may take on more or less significance depending on the context," Tepperwien, 663 F.3d at 568 (quoting Burlington Northern, 548 U.S. at 69), and "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct," id.

As a threshold matter, we note that in concluding that both plaintiffs' retaliation claims should be dismissed because neither "allege[d] any adverse employment action occurring prior to his initial engagement in protected activity," Rivera, 761 F. Supp. 2d at 58, the District Court, no doubt inadvertently, misstated the applicable law. Title VII does not require that a causal connection exist between a protected activity and an adverse employment action that occurred before that activity. In any event, RGRTA does not dispute that both Rivera and Talton engaged in protected activity — Rivera by filing a complaint with the NYSDHR,[9] and Talton by complaining to management and filing a series of EEOC charges — and that they at least alleged that some material adverse employment action occurred thereafter.

### a. Rivera

Despite the District Court's misstatement, we conclude that Rivera's retaliation claim was properly dismissed. Rivera did not present evidence of any discrete actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" after he filed his charge of discrimination with the New York State Department of Human Resources in

---

[9] The NYSDHR appears to have forwarded Rivera's complaint to the EEOC, noting that doing so "creates a complaint separate and apart from the complaint filed with" the NYSHDR. In any event, Rivera's administrative exhaustion of his Title VII claim is not at issue on appeal.

March 2007. In urging otherwise, Rivera points to two disciplinary citations he received for insubordination over a two-year period, his assignment to drive particularly "dirty buses," one late overtime payment, and Lift Line's one-time refusal to give him a half-day off for a doctor's appointment.

Although there is some dispute about whether Rivera received one or two citations for insubordination,[10] he presented no evidence that they reflected anything other than RGRTA's "enforce[ment] [of] its preexisting disciplinary policies in a reasonable manner." See Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (quotation marks omitted). Rivera testified that one of the citations came about after he refused to attend a meeting with RGRTA managers without his preferred union representative, rather than a union representative who had been selected for him. Rivera also testified that he received the second citation after he again refused to attend a meeting with one or more of his supervisors. Without more, no reasonable jury could conclude that these acts of discipline, either alone or in conjunction with the other acts of retaliation Rivera alleges, represented a departure from Lift Line's normal disciplinary practices, such that they might have "dissuaded a reasonable worker from making or

---

[10] RGRTA submits that Rivera was suspended for insubordination only once, in 2008, after he "refused to participate in an investigatory interview with" his supervisor and other RGRTA managers and his union representative, "because he insisted that his legal counsel and union business representative also be present." Rivera acknowledges that he declined to participate in an investigation without his attorney and preferred union representative, and that he received an insubordination charge for that refusal, but he testified that the "[s]ame thing" then happened a second time.

22

supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68 (quotation marks omitted).[11]

Accordingly, we affirm the District Court's grant of summary judgment to RGRTA on Rivera's retaliation claim.

**b. Talton**

By contrast, we disagree with the District Court insofar as it also granted summary judgment to RGRTA on Talton's retaliation claim. Talton presented evidence, in the form of deposition testimony, that Tiberio suggested that he could lose his job for filing complaints of discrimination. Talton's testimony echoed a previously filed EEOC charge in which he alleged that Tiberio had once indicated "that [Talton] could get fired for the filing of the EEOC charge" and "said that 'this is you[r] job too.'" A reasonable juror could find both that Tiberio threatened Talton with the loss of his job, and that this threat would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68 (quotation marks omitted).

Talton also presented evidence that when he complained to Tiberio about his co-workers' use of racial slurs, Tiberio told him to "suck it up and get over it, nigger!" In our view, such discriminatory harassment from a supervisor may alone suffice to establish an adverse employment action, as "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [third] prong of the retaliation prima facie case." Richardson, 180 F.3d at 446.

---

[11] In addition, there was no evidence that any of the alleged acts of retaliation had a material effect on Rivera's job or standing. Rivera acknowledged that his pay was not reduced after he filed the charge or at any other time during his employment at Lift Line.

In contrast to the evidence of Tiberio's harassing response to Talton's complaints was the evidence of Lift Line's almost immediate response to Stiggins's and Ayala's complaints that Talton had made disturbing comments and "false accusations" in the workplace. Very shortly after those complaints were made against Talton, who had recently filed his EEOC charges, Himmelsbach, the Vice President of Regional Operations for RGRTA, arranged a meeting during which she admonished Talton. A record of the meeting was maintained in Talton's personnel file. Based on the disputed record before us, a reasonable juror could infer that RGRTA's swift response to the complaints by Talton's co-workers was designed to, and did, send a message that Talton's employment at Lift Line was in serious jeopardy as a result of the EEOC charges. See Burlington Northern, 548 U.S. at 72–73 (action is materially adverse where plaintiff "fac[es] the choice between retaining her job . . . and filing a discrimination complaint").

Accordingly, we vacate the District Court's grant of summary judgment in favor of RGRTA on Talton's retaliation claim.

### 4. Supplemental Jurisdiction over State Law Claims

Because, as discussed above, we vacate the District Court's dismissal of Talton's federal claims under Title VII, we also vacate the judgment of the District Court dismissing Talton's state law claims against RGRTA. "[W]e have held that 'the discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of [28 U.S.C. § 1367(c)].'" Treglia v. Town of Manlius, 313 F.3d 713, 723 (2d Cir. 2002) (quoting Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 448 (2d Cir. 1998) (alteration in Treglia)). In view of our decision, we see no basis under that statute for declining to exercise supplemental jurisdiction: the state-law discrimination claim does not

24

"raise[] a novel or complex issue of State law," does not "substantially predominate[] over the claim or claims over which the district court has original jurisdiction," and does not present "exceptional circumstances" leading to "other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(1), (2) & (4). Under these circumstances, "[t]he district court . . . should retain jurisdiction over the state discrimination claim." Treglia, 313 F.3d at 723. For the same reasons, we vacate the summary dismissal of Rivera's state law hostile work environment claim. But we affirm the judgment of the District Court dismissing Rivera's claim of retaliation under state law for the same reasons that we do so with respect to his federal retaliation claim. See Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims."); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006).

## CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's judgment with respect to Enio Rivera's claims of retaliation, VACATE the District Court's judgment with respect to Rivera's hostile work environment claims and Michael Talton's claims against RGRTA, and REMAND for further proceedings consistent with this opinion.

25