17-2861(L)
Legg v. Ulster County

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

(Argued: September 27, 2018    Decided: October 29, 2020)

Docket No. 17-2861(L), 17-2863 (XAP)

ANN MARIE LEGG,
*Plaintiff-Appellant,*

PATRICIA WATSON,
*Plaintiff-Appellant–Cross-Appellee,*

–v.–

ULSTER COUNTY, PAUL J. VANBLARCUM, in his official capacity as Sheriff of the County of Ulster, and individually,
*Defendants-Appellees–Cross-Appellants.*[*]

B e f o r e :

HALL, LYNCH, and CARNEY, *Circuit Judges.*

This case—on its second trip to our Court—arises from hostile work environment claims brought by four female employees of the Ulster County Jail, including Plaintiff-Appellant–Cross-Appellee Patricia Watson. After trial in the U.S. District Court for the Northern District of New York (Scullin, *J.*), a jury awarded Watson a total of $400,000 on her claims against Defendants-Appellees–Cross-Appellants Ulster County and Paul J. VanBlarcum (together, "the County") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. In reliance on the district

---

[*] The Clerk of Court is directed to amend the caption as shown above.

court's invitation to file its post-trial motions two weeks after receiving trial transcripts, the County filed motions for judgment as a matter of law or, alternatively, for a new trial, under Fed. R. Civ. P. 50(b) and 59(b). These were untimely under the Rules, although not under the district court's invitation. The district court then *sua sponte* denied the motions based on the restrictions established by Fed. R. Civ. P. 6(b)(2) on extending time for filing such motions. On appeal, we vacated the denial order and remanded, holding that Rules 6(b)(2), 50(b), and 59(b), establish claim-processing, not jurisdictional, rules, and therefore that the court had jurisdiction to consider them on their merits if it determined that objection to untimeliness was waived or forfeited, or if an equitable exception applied. *See Legg v. Ulster Cty.*, 820 F.3d 67, 79 (2d Cir. 2016).

On remand, the district court found that Watson "constructively waived" her objection to the untimeliness of the County's motions by not objecting when the motions were filed and before the district court *sua sponte* denied them two days later. It then entered orders reducing her Title VII award to $75,000 and overturning the jury verdict in her favor on her § 1983 claim for want of evidence of an unlawful municipal custom or practice as called for by *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

Both Watson and the County now appeal. Watson assails the district court's determination that she "constructively waived" her objection to the motions' untimeliness, and further challenges the court's rejection of the jury's verdict on her § 1983 claim. For its part, the County urges on cross-appeal primarily that the district court erred by rejecting its motion for judgment as a matter of law on Watson's Title VII claim. It further submits that Watson's acceptance of remittitur on her Title VII claim forecloses entirely her appeal of the judgment.

As to Watson's procedural challenge, we decide that Watson forfeited her right to object to the untimeliness of the County's post-trial motions by failing to raise the issue contemporaneously with the district court's grant of the extension. We further reject the County's position that Watson's acceptance of remittitur on her Title VII claims forecloses her appeal of the judgment insofar as it relates to her § 1983 claim.

As to the merits, we affirm the judgment in Watson's favor on her Title VII claim and reject the County's cross-appeal seeking judgment in its favor on that claim as a matter of law. With regard to Watson's § 1983 claim against the County, we conclude that the district court erred in entering judgment as a matter of law for the County: the jury had a reasonable basis for its finding of sufficient municipal involvement to support its award to Watson. Accordingly, we AFFIRM the court's entry of judgment in Watson's favor on her Title VII claim, VACATE the court's entry of judgment for the County on Watson's § 1983 claim, and REMAND the cause with directions to reinstate

the jury's verdict accordingly and, on motion of the parties, to consider the appropriateness of remittitur on Watson's § 1983 damages award.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.

———————

STEPHEN BERGSTEIN, Bergstein & Ullrich, LLP, New Paltz, NY, Brendan Klaproth, Esq., Washington, DC, & Joseph Ranni, Esq., Florida, NY, *for Plaintiff-Appellant–Cross-Appellee Patricia Watson.*

MATTHEW J. KELLY (Amanda Davis Twinam, *on the brief*), Roemer Wallens Gold & Mineaux, LLP, Albany, NY, *for Defendants-Appellees–Cross-Appellants Ulster County and Paul J. VanBlarcum.*

Gillian L. Thomas, Lenora M. Lapidus, Women's Rights Project, American Civil Liberties Union Foundation, New York, NY & Elizabeth Morris, Cynthia Thomas Calvert, Center for WorkLife Law, UC Hastings College of the Law, San Francisco, CA, *for Amici Curiae American Civil Liberties Union Foundation, et al.*

———————

CARNEY, *Circuit Judge*:

This case—on its second trip to our Court—arises from hostile work environment claims brought by four female employees of the Ulster County Jail, including Plaintiff-Appellant–Cross-Appellee Patricia Watson. After trial in the U.S. District Court for the Northern District of New York (Scullin, *J.*), a jury awarded Watson a total of $400,000 on her claims against Defendants-Appellees–Cross-Appellants Ulster County and Paul J. VanBlarcum (together, "the County") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. In reliance on the district

3

court's invitation to file its post-trial motions two weeks after receiving trial transcripts, the County filed motions for judgment as a matter of law or, alternatively, for a new trial, under Fed. R. Civ. P. 50(b) and 59(b). These were untimely under the Rules, although not under the district court's invitation. The district court then *sua sponte* denied the motions based on the restrictions established by Fed. R. Civ. P. 6(b)(2) on extending time for filing such motions. On appeal, we vacated the denial order and remanded, holding that Rules 6(b)(2), 50(b), and 59(b), establish claim-processing, not jurisdictional, rules, and therefore that the court had jurisdiction to consider them on their merits if it determined that objection to untimeliness was waived or forfeited, or if an equitable exception applied. *See Legg v. Ulster Cty.*, 820 F.3d 67, 79 (2d Cir. 2016).

On remand, the district court found that Watson "constructively waived" her objection to the untimeliness of the County's motions by not objecting when the motions were filed and before the district court *sua sponte* denied them two days later. It then entered orders reducing her Title VII award to $75,000 and overturning the jury verdict in her favor on her § 1983 claim for want of evidence of an unlawful municipal custom or practice as called for by *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

Both Watson and the County now appeal. Watson assails the district court's determination that she "constructively waived" her objection to the motions' untimeliness, and further challenges the court's rejection of the jury's verdict on her § 1983 claim. For its part, the County urges on cross-appeal primarily that the district court erred by rejecting its motion for judgment as a matter of law on Watson's Title VII claim. It further submits that Watson's acceptance of remittitur on her Title VII claim forecloses entirely her appeal of the judgment.

As to Watson's procedural challenge, we decide that Watson forfeited her right to object to the untimeliness of the County's post-trial motions by failing to raise the

4

issue contemporaneously with the district court's grant of the extension. We further reject the County's position that Watson's acceptance of remittitur on her Title VII claims forecloses her appeal of the judgment insofar as it relates to her § 1983 claim.

As to the merits, we affirm the judgment in Watson's favor on her Title VII claim and reject the County's cross-appeal seeking judgment in its favor on that claim as a matter of law. With regard to Watson's § 1983 claim against the County, we conclude that the district court erred in entering judgment as a matter of law for the County: the jury had a reasonable basis for its finding of sufficient municipal involvement to support its award to Watson. Accordingly, we AFFIRM the court's entry of judgment in Watson's favor on her Title VII claim, VACATE the court's entry of judgment for the County on Watson's § 1983 claim, and REMAND the cause with directions to reinstate the jury's verdict accordingly and, on motion of the parties, to consider the appropriateness of remittitur on Watson's § 1983 damages award.

**BACKGROUND[1]**

## I.      The work environment at the Ulster County Jail

In 2000, plaintiff-appellant Watson began working as a corrections officer at the Ulster County Jail, leaving her position there in 2010 to retire. In 2009, Watson joined with co-plaintiffs Ann Marie Legg, Patricia Meadors, and Nancy Reyes, each a former corrections officer employed by the Ulster County Jail, to sue the County, asserting hostile work environment and other claims related to the conditions of their employment at the Jail. A 2014 jury trial produced a mixed verdict. The appeal that we address in this Opinion concerns only Watson's hostile work environment claims under

---

[1] This factual statement is taken from the testimony and exhibits introduced at trial. We note where relevant facts are in dispute.

5

Title VII and § 1983, on which the jury found in Watson's favor.[2] We refer to the testimony of all of the testifying plaintiffs, however, in evaluating Watson's contentions on appeal.[3]

*The plaintiffs' evidence*. At trial, the testifying plaintiffs offered proof of a pervasively sexualized working environment inhospitable to female employees.[4] During the years from 2007 to 2009, they testified, pornographic magazines circulated freely and openly among male Ulster County Jail officers, and numerous officers— including supervisors—used pornographic screensavers on their work computers.

---

[2] Legg and Reyes did not appeal the jury's adverse verdict as to each of them on their hostile work environment claims. In the same litigation, however, Legg unsuccessfully brought a disparate impact claim based on the County's alleged violations of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). In a separate summary order issued concurrently with this Opinion, we address her appeal of the district court's dismissal of her disparate impact claim.

[3] Watson, Legg, and Reyes testified at trial; Meadors, who withdrew her action in 2014, before trial, did not.

[4] As context for Watson's claims, we summarize here the official policies of the County during the relevant period. From 2005 through 2009, Jail employees were subject to a sexual harassment policy issued in 1995 by the Ulster County Sheriff's Department (the "Sheriff's Policy"), which prohibited any sexual conduct in the workplace that "has the . . . effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." J. App'x 376. It required personnel aggrieved by Policy violations to report the offending conduct to the Department's Internal Affairs Officer (IAO) who would then "[s]ubstantiate the complaint" and "[d]etermine if [the] victim is willing to settle the matter informally." *Id.* at 377. If an informal settlement could not be reached, the IAO was to "[e]xercise appropriate disciplinary action." *Id*. In August 2006, the County instituted a broad policy applicable to all Ulster County employees (the "County Policy"). *Id.* at 380–81. Like the Sheriff's Policy, the County Policy included a prohibition on sexual conduct in the workplace, but it represented in addition that "all information provided by complaints of harassment, and the investigations that follow, will be handled with the utmost discretion possible under the circumstances." *Id.* at 381.

For instance, as to conditions in 2007 and 2008, Reyes testified as follows:

> I saw [male officers] with the magazines of Hustler, Playboy in their hand [or] sometimes in their back pocket. They would have the pictures folded outward instead of inward so you could see what the magazine was. . . . [T]here were screen savers with women with their breasts hanging out of their shirts and their short shorts with their bottoms sticking out[.] [On their iPods] they would be playing music [with sexually explicit lyrics].

J. App'x 547–48. Reyes identified individual officers who engaged in this behavior during that time period. *Id.* She estimated that "at least two to three times a week you would see a supervisor with a new porn magazine in their hand with a sergeant and a corporal looking it over and . . . making comments [like] [']I'll do that babe anytime.[']" *Id.* at 551.

For her part, Legg testified that "going through my desk [drawers]", she found "Playboys, Maxims and occasional[ly] Hustler, which is more graphic," and estimated that she saw such magazines in the possession of certain officers on a weekly basis from February 2007 through November 2008. *Id.* at 954–57. Watson also reported seeing pornographic magazines such as Maxim and Playboy in her work area from 2007 through 2010, as well as pornographic materials on supervisors' computers, including "a screen saver of a woman with just a black sash going across her chest and her vagina[l] area." *Id.* at 994, 996. Reyes testified that, in March or April 2007, she reported the presence of "magazines being right there in plain sight on my work duty station" to two lieutenants, but no action was taken. *Id.* at 554–57. Plaintiffs also testified about workplace incidents concerning sexual comments and banter, inappropriate touching, and, in Watson's case, male officers' practice of making "references to my butt [and] references to my chest and what they would like to do sexually." *Id.* at 995–96.

7

Watson's testimony confirmed that of her colleagues. Her focus, however, and what distinguished her claim for a hostile work environment from that of the other plaintiffs, lay on two incidents that led her to complain formally about conduct directed at her by Officer Kevin Divorl, one of her non-supervisory colleagues at the Jail. In 2005, Watson was assigned to work in the Jail's intake department, where she was responsible for training Divorl, who was new at the time. She told several officers—including a supervisor, Corporal Ferro—that she couldn't work with Divorl, because he made her feel "very uncomfortable[,] the way he would look at me [and] watch me." J. App'x 996-97. During this training period, Watson testified, Divorl "would come up behind [her], put his hand around [her] chair and have his head right next to [hers], breathing down [her] neck continuously and he would come up behind [her] all the time." *Id.* at 997.

Watson asked Divorl to stop. He persisted, however, and, in a first formal complaint, she reported his behavior to Corporal Ferro. According to Watson, Ferro spoke with Divorl and then explained to Watson that "[Divorl] was training and *needed* to watch [her]." *Id.* (emphasis added). Ferro did nothing more to end Divorl's objectionable conduct, *id.*, and Watson's assignment was not altered: she continued to train and then work with Divorl.

The second incident between Watson and Divorl that led Watson to make a formal report took place two years later, in 2007. Watson, who was then stationed with Divorl in the Jail's intake department, was experiencing back pain related to a kidney infection. Watson testified that, one day during this period, Divorl brought a massage chair into the office ostensibly to help Watson with her back pain. After Watson declined to use the chair, Divorl sat himself down in it and began moaning and making vulgar remarks to her about his nether regions. This performance followed a history of

8

occasions when Divorl (like other staff, as Legg and Reyes testified) would gaze at inappropriate magazines and "comment on the women in those magazines. Talking about their breasts, what he would like to do with them," *id.* at 999–1000, as Watson recounted. Upset by Divorl's conduct, Watson complained formally once again, and this time pursued her complaint up the chain of command. It eventually came to the attention of Lieutenant Jon Becker, who was then both the Department's Internal Affairs Officer (IAO) and the Jail's warden.

According to Watson's testimony, not long after she lodged her complaint she was summoned to a meeting with Lieutenant Becker, Divorl, and Sergeant Polacco, another supervising officer. According to Watson, during the meeting Becker listened to her account of Divorl's behavior and then presented her with the draft of a letter, at the same time asking her: "What do you want me to do with him? Do you want him fired?" *Id.* at 998. Watson replied that she did not want Divorl fired. She did so, she testified, largely because she was concerned about a dismissal's potential effect on his family. *Id.* Becker then summarized: "So this matter is resolved? You don't want him fired?" *Id.* Watson testified that she felt trapped in the room with the three men, including her alleged harasser. She thought that "[t]he letter was already done," and believed that she didn't have any choice but to sign it. *Id.* Neither she nor any other witness adduced a copy of any such letter, but Watson's testimony implied that she understood it would resolve her complaint.

After the meeting, she was assigned to work with Divorl occasionally, but the Jail implemented a "rotation schedule" so that she and Divorl would not consistently be working together. *Id.* at 999. Before the meeting and the subsequent rescheduling efforts, however, when she and Divorl were "working together five nights a week," Watson "began to withdraw from my life, my children. I began having marital issues

9

because I couldn't talk to my husband. I became very depressed, very anxious, and I had a hard time going [through] day-to-day life and I hated coming to work." *Id.* at 1001.

Becker remembered the 2007 meeting differently. As he recalled, he never asked Watson whether she wanted Divorl fired, nor did he ask her to sign any sort of letter. Instead, he recalled that during the meeting he forcefully confronted Divorl—who, according to Becker, was sitting "in the corner" during the meeting with an "unhappy look"—telling him, "Patricia Watson has a legitimate sexual harassment case against you. You better pay attention, the ball is in her court." *Id.* at 814–15. Upon seeing that Watson was upset, Becker testified that he proposed to her that he remove Divorl from intake duty and proceed with processing the complaint, whereupon Watson objected, "No, no. I don't want that to happen. That's not what I want to happen. We can work together." *Id.* at 815. According to Becker, Watson was "adamant" about "not getting [Divorl] in trouble." *Id.* He also recalled that Divorl apologized to Watson at the meeting. *Id.* Becker concluded for that reason that the best solution was to have Watson and Divorl resume their "work together back down there [*i.e.*, in Intake]," under the supervision of Sergeant Polacco. *Id.* at 815–16.

Polacco, for his part, testified that Becker's meeting with Watson began in Divorl's absence, and that after Divorl was brought in Watson "started shaking and becoming visibly upset" and "was just crying for a few minutes." *Id.* at 1058-59. She kept repeating, he said, "that she wanted to be dealt with and be done with." *Id.* at 1059. Polacco denied having any recollection that Becker asked Watson if she wanted Divorl to be fired; he also denied that she was required to sign any letter or other document. *Id.* at 1061–62, 1073.

10

According to Becker, two or three months following the meeting, another sergeant reported to him that Divorl and Watson "had some issue in the past and it seems to be coming up again." *Id.* at 816. Becker then decided to remove Divorl from the intake desk where Watson was working. *Id.*

## II. Procedural History

Watson and her co-plaintiffs brought suit in May 2009, alleging hostile work environment claims under both Title VII and § 1983, among other claims. After a five-day jury trial, the jury rendered a verdict for the County as to Legg's and Reyes's claims. But the jury found for Watson, and against the County, on both of Watson's hostile work environment claims. The jury awarded her $200,000 damages as to each claim, for a total of $400,000.

Then, after the jury announced the verdict, on August 19, 2014, the district court engaged in the following exchange with counsel about post-trial motions:

| | |
|---|---|
| THE COURT: | Okay. Motions, I assume you want some time to file motions? |
| [DEFENSE COUNSEL]: | Yes, your Honor. |
| THE COURT: | I assume you are going to want the record before you file? |
| [PLAINTIFF'S COUNSEL]: | Yes, your Honor. |
| [DEFENSE COUNSEL]: | Yes, your Honor. |
| THE COURT: | We'll, let's see. Let's say two weeks from the time the record is prepared and sent out. File your motions. All right? Give you that time under the rules. |

J. App'x 1183. With no party objecting and no other matters raised, court was adjourned. *Id.* at 1184.

The trial transcript appears to have been circulated in October 2014. *See* Appellee's Br. at 67. On November 5, 2014, apparently less than two weeks thereafter— but well past the twenty-eight-day deadline for post-verdict motions set by Fed. R. Civ. P. 50(b) and 59(b)—the County moved for judgment as a matter of law or, in the alternative, for a new trial on both of Watson's claims.

On November 6, the district court *sua sponte* denied the motions as untimely, pointing to Fed. R. Civ. P. 6(b)(2), which provides that a "court must not extend the time to act" under Rules 50(b) and 59(b). The County unsuccessfully sought reconsideration of that ruling and then appealed.

On review in 2016, we vacated the district court's orders denying the motions, holding that the court erred in finding Rule 6(b)(2) to be jurisdictional. Rather, the rule is a claim-processing rule, we concluded. Accordingly, it "do[es] not affect the power of the courts and [is] subject to waiver or equitable exception." *Legg I*, 820 F.3d at 79. Having so decided, we remanded for the district court "to consider in the first instance whether [Watson] waived objection to the court's improper grant [in August] of an extension of time or whether an equitable exception to the prohibition of such extensions applied on the facts of [the] case." *Id.*

On remand, the district court ruled that Watson "constructively waived her right to object" to the untimeliness of the County's motion "as soon as the Court issued an Order dismissing the motion (regardless of whether she had a chance to do so)." *Legg v. Ulster Cty.*, No. 09-CV-550 (FJS), 2017 WL 3668777, at *3 (N.D.N.Y. Aug. 24, 2017). The court then turned to deciding the County's motions for judgment as a matter of law or for a new trial. As to Watson's Title VII hostile work environment claim, the court denied the County's motion for judgment as a matter of law and sustained the jury's verdict for Watson, but found its $200,000 damages award "clearly excessive." *Id.* at

12

*12–13. Based on that finding, the court advised the parties that it would enter an order for a new trial on the claim unless Watson agreed to a remittitur reducing the award to $75,000. *Id.* at *12. Watson accepted the remittitur, and the district court entered final judgment in that amount. As to Watson's § 1983 claims, however, the court granted the County's motion for judgment as a matter of law, concluding that Watson "did not present sufficient evidence that the hostile work environment was a result of a municipal policy or custom" under *Monell*, 436 U.S. at 694. *Id.* at *11.[5]

Both Watson and the County timely appealed. On appeal, Watson contends that that the original $400,000 judgment on her two hostile work environment claims should be reinstated, arguing first that the district court erred in finding that she "constructively waived" her objections to the County's post-trial motions. She presses the position that those motions were untimely and that the district court lacked the authority to consider them. In the alternative, she urges that the district court erred in granting judgment as a matter of law to the County on her § 1983 claim. On cross-appeal, the County argues that Watson cannot proceed with her appeal after accepting remittitur on her Title VII claim. The County also assigns error to the court's denial of its motion for judgment as a matter of law on Watson's Title VII claim. In short, no

---

[5] Although Plaintiffs' initial complaint asserted § 1983 claims against several County officers with supervisory responsibilities—then-sheriff Paul J. VanBlarcum, former sheriff Richard Bockelmann, and others—Watson did not argue at trial that any of these officials was personally involved in generating the hostile work environment she complained of so as to give rise to their *individual* liability under § 1983. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) (explaining that a plaintiff must "establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983"). Rather, Watson sought recovery under § 1983 only against Ulster County itself. Under this theory, she had to prove that the hostile work environment she complained of was the product of a County "policy or custom." *Monell*, 436 U.S. at 694.

party is happy with the results, and each of the district court's several rulings bears a distinct procedural qualification that could overcome the merits.

## DISCUSSION

**I.      Timeliness of the County's post-trial motions and related forfeiture arguments**

At the threshold, we must consider whether the district court correctly determined that Watson lost her right to object to the untimeliness of the County's post-trial motions. In *Legg I*, we concluded that Rule 6(b)(2)'s prohibition on extensions of time for filing certain post-trial motions is a claim-processing rule, and as such is subject to equitable exceptions including waiver and forfeiture. 820 F.3d at 79. We now clarify the circumstances under which a litigant may fairly be deemed to have forfeited such an objection to timeliness and rule that Watson forfeited her objection.

While time limitations in claim-processing rules have been called "inflexible" and "unalterable on a party's application," objections to noncompliance can "nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004); *see also Eberhart v. United States*, 546 U.S. 12, 19 (2005) ("These claim-processing rules thus assure relief to a party properly raising them, but do not compel the same result if the party forfeits them."). The Supreme Court has left no doubt that a party forfeits such a timeliness objection when it has "litigated and lost the [late-raised issue] on the merits," *Kontrick*, 540 U.S. at 460, and other courts have applied this understanding accordingly. *See, e.g.*, *Wilburn v. Robinson*, 480 F.3d 1140, 1147 (D.C. Cir. 2007) ("A party indisputably forfeits a timeliness objection based on a claim-processing rule if he raises the issue after the court has issued a merits decision."). This case, however, requires us to decide whether the non-moving party forfeits a timeliness objection by failing to object to the district court's grant of an extension that is not permitted by the Federal Rules of Civil Procedure.

14

Rules 50(b) and 59(b) set deadlines for the filing of post-trial motions at 28 days after entry of judgment. Fed. R. Civ. P. 50(b), 59(b). Rule 6(b)(2) provides that the district court "*must not extend* the time to act under Rules 50(b) and . . . 59(b) . . . ." Fed. R. Civ. P. 6(b)(2) (emphasis added). Rule 6(b)(2) was adopted as a part of a group of rule amendments made in 1946 to "clarify the finality of judgments." Fed. R. Civ. P. 6(b) advisory committee's note to 1946 amendment. In making this amendment, the Advisory Committee described its approach as to "list in Rule 6(b) the various other rules whose time limits may not be set aside, and then, if the time limit in any of those other rules is too short, to amend that other rule to give a longer time." *Id.* This was important, the Committee explained, because of the "established rule" that the filing of certain post-trial motions "destroys the finality of the judgment" and allows for "the full time for appeal [to] start[] anew from the date of denial" of any such motions. *Id.*

A district court may, on occasion, inadvertently rule in such a way as to extend a deadline to file a post-trial motion under Rules 50(b) and 59(b) past the 28-day mark despite the prohibition in Rule 6(b)(2). When a district court grants such an extension and a party has an opportunity to object contemporaneously with the extension's grant, a party forfeits any objection to the timeliness of the motions by failing to do so at the time. *See Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1359 n.15 (11th Cir. 2010) ("[S]ince Rule 6(b) is a claims-processing rule, . . . in failing to object to the district court's violation of the rule (by extending the time for filing post-trial motions) [the non-filing party] forfeited its objection to the time extension."). This rule applies whether the court proposes the extension, as occurred here, or whether the opposing party requested it. Such a rule seems to us to best balance judicial interests in both close

15

adherence to Rule 6(b)(2) and in fairness.[6]

Watson urges us to adopt a different rule—that formulated by the Eighth Circuit in *Dill v. General American Life Ins. Co.*, 525 F.3d 612 (8th Cir. 2008). In *Dill*, the defendant moved in the district court for an extension of time within which to file a Rule 50(b) motion; plaintiff did not oppose when the motion was made; and the district court granted the motion, thereby violating Rule 6(b). *Id.* at 615. The plaintiff raised objections to the timeliness of the motion only later, as a part of his merits opposition to the Rule 50(b) motion. *Id.* On appeal, the *Dill* court held that, although the plaintiff had failed to object to the motion for extension of time until "it was too late for [defendant] to take any corrective action," the objection was nonetheless timely and not forfeited because it came before the district court's decision on the merits. *Id.* at 619.

We decline to adopt the *Dill* rule that a party may freely raise a timeliness objection at any time before the district court renders its decision on the merits. Although the rule offers a measure of clarity, it presents the attractive opportunity to

---

[6] Balancing these interests is also important because a district court's inadvertent breach of the Rule 6(b)(2) "no-extension" rule can have consequences for the fate of an appeal. Thus, Fed. R. App. P. 4(a)(4)(A) provides that, so long as certain post-trial motions are filed "within the time allowed by [the Federal Rules of Civil Procedure]," then "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(A). An amendment made in 2016 substituted the phrase "within the time allowed" for an earlier reference to a party's "timely" filing of a post-trial motion. The amendment was reportedly designed to clarify that the time within which an appeal must be filed "is *not* altered by, for example, *a court order that sets a due date that is later than permitted by the Civil Rules, another party's consent or failure to object to the motion's lateness*, or the court's disposition of the motion without explicit reliance on untimeliness." Fed. R. App. P. 4(a)(4)(A) advisory committee's note to 2016 amendment (emphasis added). Thus, a mistaken extension such as occurred here can lead an inattentive party to untimely file its notice of appeal, with consequent loss of appellate jurisdiction. *See Bowles v. Russell*, 551 U.S. 205 (2007); *Dill*, 525 F.3d at 620 (calling the loss of jurisdiction a "harsh and unfortunate result"). We need not address such a scenario here, however: both parties timely filed their notices of appeal within the statutory 30-day period following the district court's entry of judgment. *See* 28 U.S.C. § 2107(a).

any party who knows the rule to choose nevertheless to withhold objection until the untimely merits motion is filed. That party would be able, through strategic silence, to achieve the result, with shades of unfairness both to the moving party and to the court, of defeating a potentially meritorious substantive motion.

In this case, the district court proposed that the parties take until two weeks after the trial transcripts became available to file their post-trial motions. J. App'x 1183. Watson's opportunity to object to untimeliness arose when the district court made that proposal in open court. Had Watson objected at the time, she would have triggered claim-processing Rule 6(b)(2), requiring her own timely filing and timely filing by the County of their post-trial motions. Watson not only failed to object then; rather, she agreed generally to the proposed extension.[7] Accordingly, the district court correctly treated Watson as having lost any timeliness objection, and correctly proceeded to consider the County's post-trial motions on the merits.

## II.  Whether Watson may appeal the judgment after accepting remittitur

The County also maintains that Watson is foreclosed from appealing any portion of the judgment by accepting the district court's remittitur of her Title VII award. *See Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1977) ("[A] plaintiff cannot appeal the

---

[7] Watson affirmatively agreed to the proposed two weeks after the transcripts were ready for filing any post-trial motions. J. App'x 1183. Because the record does not reflect definitively that Watson knew that the district court's new timeline would result in an untimely filing—the time frame for production of transcripts being unstated—we cannot say with complete assurance that she knowingly waived her right to make a timeliness objection. Taking a somewhat different tack on remand, the district court ruled that Watson "constructively waived her right to object" to the untimeliness of the County's motion "as soon as the Court issued an Order dismissing the motion (regardless of whether she had a chance to do so)." *Legg*, 2017 WL 3668777, at *3. We agree with the district court that Watson lost her right to object, but we do not agree with its implication that Watson was entitled to object to the extension at any time up to the court's dismissal of the action.

propriety of a remittitur order to which [s]he has agreed."). We are unpersuaded. Our sister circuits have unanimously held that accepting remittitur on one claim does not bar a plaintiff from appealing claims that are "separate and distinct." *See, e.g.*, *Denholm v. Houghton Mifflin Co.*, 912 F.2d 357, 360 (9th Cir. 1990) ("[W]e must analyze whether each issue on appeal is a separate and distinct cause of action from the subject of the remittitur."); *Lanier v. Sallas*, 777 F.2d 321, 325 (5th Cir. 1985) ("[T]he acceptance of remittitur on one count of a complaint does not bar an appeal from an adverse judgment with respect to an entirely separate and distinct cause of action."). We expressly adopt the view presented in those decisions. Appeals following remittitur orders are generally prohibited because otherwise, as we explained long ago, "a plaintiff would have nothing to lose by accepting a remittitur 'under protest,' thereby guaranteeing himself a minimum verdict, and then proceeding to the court of appeals in an effort to restore the sum which had been disallowed by the district judge." *Donovan v. Penn Shipping Co.*, 536 F.2d 536, 537 (2d Cir. 1976), aff'd, 429 U.S. 648 (1977). These considerations do not apply to causes of action that "require different evidentiary showings." *Denholm*, 912 F.2d at 361.

In this case, Watson was required to prove different elements to establish her Title VII and § 1983 hostile work environment claims—namely, to prove a § 1983 claim against Ulster County, she needed to demonstrate that "an official policy of the municipality caused [her] constitutional injury," *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); for her Title VII claim she did not. Accordingly, her § 1983 claim is "separate and distinct" from her Title VII claim, and she may proceed with her related appeal.

18

### III. The district court's denial of the County's Rule 50(b) motion as to Watson's Title VII claims

We review *de novo* the denial of a motion for judgment as a matter of law, considering "the evidence in the light most favorable to the party against whom the motion was made and . . . giv[ing] that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 93 (2d Cir. 2012).[8] A district court may grant a motion for judgment as a matter of law only "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In making this determination, "it may not make credibility determinations or weigh the evidence. . . . [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000).

To prove a hostile work environment claim under Title VII, a plaintiff must establish that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). This showing has both objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also "subjectively perceive that environment to be abusive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004). In our analysis, we consider "the totality of the circumstances,

---

[8] Unless otherwise indicated, all quotations in this Opinion omit internal quotation marks, alterations, citations, and footnotes.

including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera*, 743 F.3d at 20 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).

The district court carefully considered the evidence in the trial record and found that the testimony given by the three plaintiffs concerning the pervasive presence and use of pornographic magazines and screensavers (including by supervisory officers), sexual comments made by various officers about Watson's body, and the several specific incidents with Officer Divorl and his ongoing behavior were sufficient for a reasonable jury to conclude that Watson was subjected to a hostile work environment when employed at the Jail. **[SA 30–36]** Although these incidents occurred over a prolonged period of time, the Divorl incidents were of particular significance. On *de novo* review we agree with the district court's ruling.

In challenging the district court's conclusion, the County relies on our decision in *Alfano v. Costello*, 294 F.3d 365 (2d Cir. 2002), where we reversed a district court's denial of a motion for judgment as a matter of law on a hostile work environment claim brought under Title VII. We find *Alfano* inapposite. In *Alfano*, the plaintiff complained of minor pranks involving sexual innuendo that took place over a number of years, as well as an isolated comment that the plaintiff ate food in a "seductive manner." *Id.* at 370. While clearly inappropriate in the workplace, the conduct presented in *Alfano* was far less severe than that evidenced in this case. Drawing all reasonable inferences in favor of Watson, we have no difficulty concluding that the jury had a legally sufficient evidentiary basis for finding that Watson experienced a hostile work environment at the Ulster County Jail.

The County argues in the alternative that the verdict cannot stand because Watson's evidence was not legally sufficient to allow the jury to impute Divorl's conduct to it as Watson's employer. Under Title VII, an employer is liable for the harassing conduct of a non-supervisory employee only if it either "failed to provide a reasonable avenue for complaint" or if "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009).

Interpreting the evidence in the light most favorable to Watson, required on review of this jury verdict favorable to her, the district court found that in 2005 the County took no action at all with regard to Divorl's actions, which Watson had reported to Corporal Ferro. It found further that Lieutenant Becker mishandled her 2007 complaint by inviting Divorl to a meeting in circumstances that both were, and that Watson experienced as, highly intimidating, and then giving her the stark choice between having Divorl fired or waiving her right to proceed on a formal complaint. **[SA 39–40]** Crediting Watson's testimony, and disregarding the contrary narratives provided by Becker and Polacco—the jury was not required to believe their conflicting testimony—the district court correctly found that the jury had a sufficient basis to determine that the County failed to respond adequately to Watson's complaint and was therefore liable for Divorl's actions as his employer. *See Legg*, 2017 WL 3668777, at *9.

Accordingly, we affirm the district court's ruling denying the County's motion for judgment as a matter of law on Watson's Title VII hostile work environment claim.

21

**IV.     The district court's grant of the County's Rule 50(b) motion with regard to Watson's § 1983 claims**

As with a decision denying a Rule 50 motion for judgment as a matter of law, we review *de novo* a district court's decision granting such a motion. *Cash v. Cty. of Erie*, 654 F.3d 324, 332–33 (2d Cir. 2011).

Section 1983 authorizes private suits against any "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Sex-based discrimination in public employment is actionable under § 1983 as a violation of the Equal Protection Clause of the Fourteenth Amendment, which protects "public employees from various forms of discrimination, including hostile work environment . . . on the basis of gender." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). The threshold standard for proving a hostile work environment claim is generally the same for both Title VII and § 1983. *Id.* ("Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII . . . .").

It has long been established that "[m]unicipalities and other local government bodies . . . are considered 'persons' within the meaning of § 1983." *Back v. Hastings-On-Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004). Local governments, however, are not subject to *respondeat superior* under § 1983 liability merely because their employees created a hostile work environment. *See Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."). Instead, such entities may be held liable under § 1983 only if their "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

22

represent official policy, inflicts the injury." *Id.* at 694. Such a policy need not be formal in nature: it can be demonstrated by proof of acts that were "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012). A custom, policy, or usage may also be "inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Id.*

Here, on the County's post-trial motion, the district court ruled that the record contained insufficient evidence for a reasonable jury to conclude that the County maintained a policy that tolerated Divorl's harassing behavior. Notwithstanding its earlier conclusion, in the Title VII context, that the jury had sufficient evidence to find that the County failed to take appropriate remedial action in response to Watson's complaints, the court concluded that what it characterized as "two relatively isolated incidents occurring two years apart" did not demonstrate a "policy or custom" of tolerating sexual harassment. *Legg*, 2017 WL 3668777, at *11. We are compelled to agree with the district court that the evidence of the County's inadequate response to Divorl's conduct did not reflect a practice that was sufficiently systematic or characteristic over this extended period to constitute a "custom, policy, or usage." *Id*. at *10. It therefore cannot form the basis for imposing § 1983 liability.

We disagree with the district court, however, that this conclusion dooms Watson's § 1983 claim. In the Title VII context, the court also found that Watson's "testimony regarding the pervasiveness of the pornographic material and use of explicit screen savers is sufficient enough that the jury could have concluded that officials at the jail acquiesced to its existence." *Id.* at *11 Nevertheless, it found that this evidence— largely uncontested by the County on appeal—was insufficient to demonstrate a hostile work environment under § 1983, therefore concluding that the jury verdict must have rested on an unreasonable view that the incidents with Divorl reflected sufficiently

23

pervasive conduct to form part of a municipal custom, policy, or usage. In doing so, the court may have been swayed by the fact that the jury returned a verdict for the County as to Legg and Reyes's hostile work environment claims, which were largely based on the presence of the offensive magazines and screen savers, and which were not based on Watson's testimony concerning Divorl's harassing conduct toward her.

But, as the district court recognized in another portion of its opinion, a court's task on a Rule 50 motion "is not to examine different aspects of the jury's verdict to determine whether they can be logically reconciled with one another." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 546 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). Instead, the court may grant such a motion only where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In our view, that exacting standard is not met in this case.

The jury heard testimony from three plaintiffs painting a picture of a pervasively sexualized atmosphere obviously inhospitable to female employees, where pornographic magazines circulated freely and openly between male corrections officers; officers posted vulgar screensavers on their work computers; and aggressively sexual comments in the workplace were commonplace and went unconfronted by supervisors. We have repeatedly held that the presence of pornography in a workplace can constitute a hostile work environment. *See Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) ("[T]he mere presence of pornography in a workplace can alter the 'status' of women therein and is relevant to assessing the objective hostility of the environment."); *Wolak v. Spucci*, 217 F.3d 157, 161 (2d Cir. 2000) ("[P]ornography might still alter [a woman's] status in the workplace, causing injury, regardless of the trauma inflicted by the pornographic images alone."); *cf. Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310,

24

322 (2d Cir. 1999) (Newman, *J.,* concurring and dissenting) ("[A] prolonged display of photos of nudes, rife with sexually explicitly [sic] activity, could reasonably be found only to constitute a hostile work environment.").

While different inferences might be drawn from the competing testimony given at trial, on review of a Rule 50 motion we must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. A reasonable jury could conclude that those conditions that were undisputedly acquiesced in by the County created a workplace that was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera*, 743 F.3d at 20.

Accordingly, we vacate the district court's judgment in favor of the County on Watson's § 1983 claim. Because the district court granted the County's Rule 50 motion for judgment as a matter of law as to this claim, it did not have occasion to consider the County's Rule 59 motion for a new trial. Although we leave this question for the district court to rule on in the first instance, we note that "jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). For the same reasons as those described in our analysis of the Rule 50 question, it is doubtful whether this is a case in which disturbing the verdict would be justified. *See also id.* at 417–18 (new trial appropriate when a verdict is against the weight of the evidence only when it is "seriously erroneous" or "a miscarriage of justice").

The same is not true, however, with respect to the issue of damages. Finding that Watson provided minimal testimony about the emotional distress caused by her working environment, the district court remitted the jury's $200,000 judgment on Watson's Title VII claims to $75,000, and, under threat of a new trial, she accepted that

25

remittitur.[9] We therefore remand the cause to the district court to consider, in the first instance, whether remittitur is appropriate under Rule 59(e) as to Watson's § 1983 claim. *Cf. Negron v. Ulster Cty.*, No. 08-CV-692 (FJS), 2012 WL 3597398, at *7 (N.D.N.Y. Aug. 20, 2012) ("[T]he amount of damages awarded for [Title VII and § 1983] claims should bear some resemblance to each other."). In so holding, we note that although the elements of the hostile work environment claim may be identical under both causes of action (with the exception of the "custom, policy, or usage" requirement for *Monell* liability), the injury to be compensated under § 1983—denial of Watson's constitutional right to equal protection in her public employment—is separate and distinct.

## CONCLUSION

The judgment of the district court is **AFFIRMED** as to Watson's Title VII hostile work environment claim. The judgment is **VACATED** as to Watson's § 1983 claim and the cause is **REMANDED** for the district court to reinstate the jury's verdict and, on motion of the parties, to consider the appropriateness of remittitur on Watson's § 1983 damages award. The court may accept additional submissions by the parties as to damages in its discretion.

---

[9] We have no jurisdiction to review the district court's remittitur of the jury's award on Watson's Title VII claims since Watson accepted it. We observe, however, that the court's conclusion that Watson "only . . . suffered emotional distress on account of Divorl's conduct" because she "did not attribute any emotional distress to the pornographic magazines or screensavers," *Legg*, 2017 WL 3668777, at *12, is inaccurate. While the bulk of Watson's testimony was concerned with the various incidents involving Divorl, and the description of her emotional distress was linked to this testimony, that is not cause to conclude that the other conditions prevailing within her work environment did not unreasonably interfere with her work performance, that she did not subjectively perceive them as abusive, or that she is not entitled to compensatory damages under § 1983 for the deprivation of her constitutional right to equal protection under the law.