21-1527-cv
Allison Williams v. New York City Housing Authority

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2021

(Argued: June 10, 2022          Decided: February 23, 2023)

Docket No. 21-1527-cv

_____

ALLISON WILLIAMS,

*Plaintiff-Appellant,*

v.

NEW YORK CITY HOUSING AUTHORITY, NYC COUNCIL SPEAKER
MELISSA MARK-VIVERITO, BRIAN CLARKE, and MICHAEL KELLY,

*Defendants-Appellees.*[1]

_____

Before: POOLER, LYNCH, and LOHIER, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Vernon S. Broderick, *J.*) granting Defendants' motions for summary judgment and dismissing Plaintiff's claims that Defendants created a hostile work environment in violation of federal, state, and city law. Because we conclude that a reasonable jury could find that the totality of the circumstances

[1] The Clerk of Court is directed to amend the caption as set forth above.

established an unlawful hostile work environment, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

Vacated and remanded.

_____

MARCEL FLORESTAL, Florestal Law Firm, PLLC, New York, NY, *for Plaintiff-Appellant*.

HANH H. LE (Sean-Patrick Wilson, *on the brief*), *for* Lisa Bova-Hiatt, Executive Vice President for Legal Affairs and General Counsel, New York City Housing Authority, New York, NY, *for Defendants-Appellees New York City Housing Authority, Brian Clarke, and Michael Kelly*.

PHILIP W. YOUNG (Richard Dearing, Claude S. Platton, *on the brief*), *for* Georgia M. Pestana, Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellee Melissa Mark-Viverito*.

POOLER, *Circuit Judge*:

Alleging the creation of a hostile work environment in violation of federal, state, and city law, Allison Williams sued the New York City Housing Authority ("NYCHA"); Brian Clarke and Michael Kelly, two NYCHA senior officials (collectively, the "NYCHA Defendants"); and Melissa Mark-Viverito, the former Speaker of the New York City Council (collectively, "Defendants"). The United

States District Court for the Southern District of New York (Vernon S. Broderick, *J.*) granted summary judgment to Defendants. *See Williams v. N.Y.C. Hous. Auth.*, No. 16-cv-8193, 2021 WL 2077817 (S.D.N.Y. May 24, 2021). Because we conclude that a reasonable jury could find that the totality of the circumstances established an unlawful hostile work environment, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

# BACKGROUND

**I.    Factual Background**

Williams, an African-American woman, worked for NYCHA from 1984 until her retirement in 2017. After rising through the ranks over two decades, Williams became the housing manager of Mill Brook Houses in the Bronx in 2006. As housing manager, Williams could not be fired absent disciplinary charges and a trial (administrative hearing). This suit centers on Williams's claims that, for several years preceding her retirement, she was subjected to a racially hostile work environment. In reviewing the district court's grant of summary judgment to Defendants, we construe the evidence in the light most favorable to Williams, "drawing all reasonable inferences and resolving all

ambiguities in [her] favor." *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 504 (2d Cir. 2010) (internal quotation marks omitted).

### A. Williams's Allegations

Williams alleges that the trouble began on July 1, 2015 when Melissa Mark-Viverito, the then-Speaker of the New York City Council, requested a meeting with NYCHA. Although Mark-Viverito was not an employee, contractor, or agent of NYCHA, she wielded substantial influence over it in her role as Speaker. The City Council has oversight authority over NYCHA, and roughly seven percent of NYCHA's budget comes from city funds.[2] In the lead up to the July 2015 meeting that precipitated the events at issue, Brian Honan, NYCHA's director of state and city legislative affairs, emailed NYCHA's Chair, Shola Olatoye, stating, "[t]he manager at Mill Brook is making it very difficult for

---

[2] Sarah Gastelum & Emre Edev, The Council of the City of New York, *Report on the 2015-2019 Operating and Capital Budget & the Fiscal 2015 Preliminary Mayor's Management Report, New York City Housing Authority* 12 (2015), https://council.nyc.gov/budget/wp-content/uploads/sites/54/2015/06/fy2016-nycha.pdf. Though this fact does not appear in the record, the Court may take judicial notice of facts "generally known within the territorial jurisdiction" or facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Dixon v. von Blanckensee*, 994 F.3d 95, 102 (2d Cir. 2021) (internal quotation marks and citation omitted). Here, the Court takes judicial notice of the percentage of NYCHA's operating budget that is derived from city funds.

[Mark-Viverito] to support [the Optimal Property Management Operating Model]." App'x at 711. Mill Brook Houses was one of the original properties in the Optimal Property Management Operating Model ("OPMOM") program, a property-management pilot program that NYCHA launched in January 2015. Managers of OPMOM properties exercise more control to determine the development's staffing needs and set their own budgets. It is reasonable to infer that NYCHA wished to please Mark-Viverito and ensure her satisfaction with its management in order to maintain city funding.

The meeting took place July 30, 2015 in Mark-Viverito's office. In attendance were Williams; Mark-Viverito; Honan; Marcela Medina, the state legislative affairs officer in NYCHA's City and State Legislative Affairs Department; James Artis, OPMOM's regional asset manager for the Bronx; Sybil Colon, OPMOM's director; Princella Jamerson, Mill Brook Houses tenant association president; Diana Ayalau, from Mark-Viverito's office; and Gloria Cruz, Mark-Viverito's constituent services liaison. NYCHA's Senior Vice President, Brian Clarke, attended by phone. NYCHA's General Manager, Michael Kelly, did not attend.

During the meeting, Mark-Viverito, who identifies as Latina, Mark-Viverito Br. at 10, asked Williams how she was "handling [her] Spanish speaking residents at Mill Brook Houses." App'x at 315–16. Williams, who does not speak Spanish, said she used the NYCHA language bank to locate a Spanish speaker to provide translation services over the phone. Mark-Viverito told Williams that using the language bank was unacceptable, and that Mill Brook Houses needed a Spanish-speaking person in the office. Williams responded that she also sometimes called the Spanish-speaking Mill Brook superintendent or the caretakers' supervisor to translate for her. This too was unacceptable to Mark-Viverito, who Williams alleges then "slammed her fist" on the table, "screamed" that "she wanted a Spanish manager about three times," and was "very hostile, [and] very angry." App'x at 1277–78. At this point, Colon added that NYCHA had no job title called "bilingual housing manager[]" but did have "bilingual housing assistants." App'x at 157. She offered to contact human resources to try to bring one to Mill Brook Houses. Mark-Viverito rejected these recommendations and abruptly stood up, signaling the end of the meeting.

Following the meeting, Williams, Colon, and Artis remained in the office to process what had transpired; Colon was "too shaken to even stand up," and

6

Williams had to compose herself as "she was practically in tears." App'x at 1137. They rehashed what happened, all agreeing that the Speaker's request for a "Spanish manager" was "racist." App'x at 1138. Two days later, Williams met with Colon and Artis again, as the July 30 "meeting did not sit well with [her]," and she felt she was being "bullied" for not speaking Spanish. App'x at 325–26. Williams feared the NYCHA Defendants would remove her from her position.

Meanwhile, following the July 30 meeting, Clarke met with his supervisor, Kelly, to discuss transferring Williams out of the OPMOM program. Clarke lacked the authority to transfer Williams, but he recommended her transfer to Kelly and human resources. Kelly did not object to Clarke's recommendation.

The next day, July 31, 2015, Clarke met with Colon. Clarke asked Colon to work with human resources to transfer Williams; he said he could not do it himself because he was going on vacation. Clarke then asked Colon not to use the words "Spanish manager" when speaking with Kenya Salaudeen, NYCHA's director of human resources. App'x at 171. Instead, Clarke advised Colon to tell Salaudeen that Williams's transfer was necessary because of Mill Brook Houses' "cultural sensitivity needs." App'x at 171. The following week, Colon called Salaudeen to tell her that Clarke directed her to transfer Williams and replace her

7

with a Hispanic manager. According to Colon, Salaudeen "raised her voice" and said, "I'm offended by what you're saying to me as a [B]lack woman." App'x at 774. Colon responded: "Look, Mr. Clark[e] wants it done. [He] said to tell you that Melissa [Mark-]Viverito wants it done. It has to be and Mr. Kelly wants it done." App'x at 774. Salaudeen replied: "I don't care if Obama wants it done, it's illegal and you can be sued." App'x at 774. Later in the conversation, Salaudeen again told Colon that it is "illegal to make race[-]based transfers." App'x at 775. Colon testified that she had a follow-up phone call with Richard Bernardo, Salaudeen's deputy director of human resources, and human resources employee Marla Edmonson, both of whom also told her it would be illegal to replace Williams with a Hispanic manager.

Over the next month, several NYCHA employees asked Colon about the status of Williams's transfer. On August 6, 2015, for instance, Sheila Pinckney, a senior advisor in NYCHA's Office of the Senior Vice President of Operations, emailed Colon on Clarke's behalf to ask whether the "move [was] complete[] . . . regarding the Property Manager at Mill Brook Houses." App'x at 1063. Colon responded,

8

HR needs more information from us. There is also an [Inspector General ("ig")] investigation going on. HR wants to talk to the ig's office first.

App'x at 1063. Six days later, on August 12, 2015, Colon emailed Clarke to convey that she was

experienc[ing] difficulty with the transferring of the Manager at Mill Brook. HR is requesting information that I am unable to provide. . . . We reached out to the local political office where we had the meeting at and they did not [] provide complaint documentation or specifics.

App'x at 986. Colon and Clarke exchanged more emails on August 25, 2015, after Clarke returned from vacation. Among other things, Colon told Clarke that she had

forwarded HR the development's resident population data and was informed that this was not enough information. I also contacted the political office where we had the meeting at and they stated they only had one repair complaint for [Williams]. This information was also shared with HR.

App'x at 990.

On August 28, 2015, there was a monthly meeting for the OPMOM properties in the Bronx. Among the people in attendance were Williams, Clarke, Colon, Artis, Luis Ponce, NYCHA's senior vice president of operations, and Melania Allen, NYCHA's director of Bronx property management. Williams testified that during this meeting Clarke questioned her about Mill Brook

9

Houses' "stats" and "asked [her] about the Spanish speaking thing" in a "nasty" manner before the whole group. App'x at 350–52, 1064. Additionally, during the meeting Colon announced her resignation. As discussed further below, Colon later sued NYCHA, Clarke, Kelly, and Mark-Viverito, alleging retaliatory discrimination under federal, state, and city law. *See Colon v. N.Y.C. Hous. Auth.*, No. 16-cv-4540, 2021 WL 2159758, at *1 (S.D.N.Y. May 26, 2021).

Ultimately, Williams was never transferred. According to Clarke, the transfer did not occur in 2015 "because it was recommended to me [by the Law Department] not to transfer at this time." App'x at 426. Nevertheless, Williams contends, her superiors attempted to sabotage her work. Mill Brook Houses had long been allocated four Housing Assistants ("HA") to assist Williams. Following Colon's resignation, Williams asserts that the NYCHA Defendants deliberately neglected to timely replace four HAs who all left, for various reasons, between August 2015 and mid-2016. First, HA Rebecca Iyanda requested a transfer and was instructed to report to a different housing program on October 6, 2015; in November 2015, Iyanda was administratively transferred and replaced with HA Celeste Mangum, whose termination Williams sought and procured two months later. Williams sought to have Mangum replaced, to no

avail. Next, on December 28, 2015, HA Tamika Powell left a vacancy at Mill Brook Houses when she was promoted to Assistant Housing Manager at Marble Hill Houses. A third HA, Tina McLain, took medical leave from October 22, 2015 through December 24, 2015; on her return, according to Williams, she was transferred without explanation. Finally, in December 2015, HA Hafiz suffered a death in her family and did not come to work for a period of time. Hafiz did eventually return to work.

Saddled with these vacancies, Williams instructed her assistant, Fredericka Dilworth, to contact NYCHA management for replacements. Due to various delays, interviews for HA replacements were not scheduled until February 2016. In Williams's view, the failure to timely replace the HAs was part of an "orchestrated effort to deprive [Williams] of essential personnel at Mill Brook, setting her up to fail so that [Defendants] could justify removing her as manager, pursuant to [Mark-Viverito's] request." *Williams*, 2021 WL 2077817, at *6.

Williams also alleges that in early 2017, her Spanish-speaking superintendent, Ralph Martinez, was transferred from Mill Brook Houses and replaced with an assistant superintendent referred to in the record only as "Limo." According to Williams, while Martinez had been indispensable to her

management team, Limo's performance was deficient, as he had previously been placed on probation due to his refusal to work. Williams saw Martinez's transfer as part of Defendants' scheme to sabotage her work.

Williams resigned as Mill Brook Houses' manager two weeks after Limo arrived, on May 1, 2017 because she was "highly stressed, could not do her work with zero [] staff and . . . suspected that NYCHA Defendants were setting her up to fail so they [could] either remove, or terminate, her from Mill Brook." *Id*. at *9.

## B. The Defendants' Allegations

Unsurprisingly, Defendants do not view these events the same way. They vigorously contest Williams's description of what occurred during the July 30, 2015 meeting with Mark-Viverito. Defendants claim that the purpose of this meeting was to address significant language barriers between NYCHA employees and Mill Brook Houses' Spanish-speaking residents. Mark-Viverito testified that, in the months leading up to the meeting, she received numerous complaints from her constituents that their needs were not being met. For instance, on October 30, 2014, a Mill Brook House resident complained to Mark-Viverito that "[e]very time [the resident] goes to the [Mill Brook] office he feels

12

like he's being bullied by management because he cannot speak English," making "him sick and upset." App'x at 964.

On May 14, 2015, Honan, NYCHA's director of state and legislative affairs sent an email stating that,

[t]he manager at Mill Brook is making it very difficult for [Mark-Viverito] to support OPMOM. Yesterday I heard from three of her staff members who complained about a recent meeting at the development. . . . [Williams] ma[d]e a very insensitive remark about Spanish[-]speaking residents.

App'x at 711. Multiple people also allegedly heard Williams make derogatory remarks about Spanish-speaking residents, including Williams saying during a tenant association meeting that she did not want to hear any "mira mira talk." App'x at 711. In light of those remarks, Mark-Viverito testified that the July 30 meeting was to "find out from NYCHA what they were doing to address the concerns of the Spanish-speaking residents of Mill Brook houses." App'x at 461.

Defendants also paint a different picture as to what occurred at the July 30, 2015 meeting. Medina, NYCHA's state legislative affairs officer, took notes in the meeting, observing that the "staff is very rude," "management must at least represent the language," and "follow-up[:] see about hiring a Spanish speaker." App'x at 978. A day after the meeting, Medina reported in an email that the

13

meeting "went okay—speaker was very upset, the insult things didn't come up but she wants us to address the language barrier issue," and that "it[']s a bit complicated . . . but the idea is to bring a housing assistant who can speak [S]panish." App'x at 1046. Defendants maintain that Mark-Viverito never uttered the phrase "Spanish manager." App'x at 418–19.

As for Clarke's directions to replace Williams and separately, his comments at the August 28, 2015 meeting, Defendants deny that the directions and Clarke's conduct were racially motivated. Clarke testified that although no one requested that he remove Williams as Mill Brook Houses' manager, he wanted to transfer her out of the OPMOM program because she "was not a good manager." App'x at 419–20. Specifically, her

> performance, certainly while I was involved with the program, was
> not good. She was never prepared for meetings, she never had a
> corrective action plan for whatever the issue was, and frankly I just
> thought it was just unbelievable that a property manager would
> ridicule tenants because of their inability to speak English, and
> violate a Mayoral order for language access for city services at a
> public meeting. That was the straw that really kind of broke the
> camel's back for me. This program, the [O]ptimal [P]roperty
> [M]anagement [P]rogram, was supposed to be the vanguard of how
> we were going to change the way that we were going to manage our
> properties. Customer service, resident engagement was a key part of
> that, and for a manager to tell somebody who is limited English-
> speaking that, you know, don't communicate with me, . . . that was

14

just it for me, and I wanted to have her removed from the program and then also disciplined for what she did at that meeting.

App'x at 420. The record reflects that at least some of these performance issues were documented. On August 3, 2009, Williams entered into a Local Hearing Settlement Agreement, and she agreed to a loss of two days of annual leave in exchange for dismissal of three charges of failure to perform duties; on January 20, 2015, Williams was served with three charges of incompetency and/or misconduct and was then found guilty of two of the charges; and, in every year between 2007 and 2014 (except for 2010), she was subject to counseling memoranda for a variety of on-the-job deficiencies.

Defendants also contest that the unfilled HA vacancies were connected to any alleged plan to undermine Williams. Rather, they note, it was Williams's responsibility as the housing manager to notify human resources of vacancies by submitting a PD2 form, used to request employee replacements. Defendants point out that Williams failed to file the required form. Indeed, on December 29, 2015, a human resources employee reminded Williams that Mill Brook Houses needed to submit PD2 forms so two of the HA vacancies could be filled, but the forms were not submitted until January 26, 2016. Defendants also point to

15

Williams's deposition testimony that she 1) never saw a document promising that OPMOM developments would never be understaffed; 2) did not know if other OPMOM developments always had their desired numbers of staff; and 3) did not know if there was any connection between the July 30, 2015 meeting and any subsequent personnel changes at Mill Brook Houses.

Finally, as to the replacement of Superintendent Martinez with Limo, Defendants note that Williams admitted that she never asked Martinez why he transferred out of Mill Brook Houses, and that there is no policy prohibiting NYCHA from transferring staff in OPMOM developments.

**II.    Procedural Background**

Williams filed the operative amended complaint in this action on October 28, 2016. Her claims included: 1) creation of a hostile work environment based on race and national origin, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 296, *et seq.* (Count One); the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.* (Count Two); and 42 U.S.C. § 1981 (Count Seven); 2) aiding and abetting violations, through the creation of a hostile work environment, of state law, in violation of NYSHRL § 296(6) (Count Three), and of city law, in violation of NYCHRL § 8-

16

107(6) (Count Four); 3) conspiracy to deprive Williams of her constitutional rights, in violation of 42 U.S.C. § 1985 (Count Five) and § 1983 (Count Six); 4) violation of the Equal Protection Clause of the Fourteenth Amendment (Count Eight); and 5) intentional infliction of emotional distress, in violation of state law (Count Nine).

On September 10, 2018, the district court granted in part Defendants' motion to dismiss the amended complaint. *See Williams v. City of New York*, No. 16-cv-8193, 2018 WL 4308552 (S.D.N.Y. Sept. 10, 2018). The court dismissed all the claims against the City; the claims against Mark-Viverito for unlawful creation of a hostile work environment, violations of Sections 1981, 1983, and 1985, the Equal Protection Clause, and intentional infliction of emotional distress; and the claim against Clarke and Kelly for violation of Section 1985 and intentional infliction of emotional distress. *Id.* at *10. That left 1) the state and city law hostile work environment claims against NYCHA, Clarke, and Kelly; 2) the aiding and abetting claims against Mark-Viverito, NYCHA, Clarke, and Kelly; and 3) the claims under Sections 1981, 1983, and the Equal Protection Clause against Clarke and Kelly. *Id.*

17

Following discovery—which the district court consolidated with the discovery in Colon's retaliation suit—the court granted summary judgment to Defendants on the remainder of Williams's claims. *See Williams*, 2021 WL 2077817, at *1. Though the district court dismissed Williams's hostile work environment claims against NYCHA, Clarke, and Kelly,[3] two days after issuing its decision here, it denied, in large part, motions by the same defendants in Colon's case. The district court concluded that Colon had raised genuine issues of material fact "concerning whether NYCHA retaliated against" Colon and "whether Defendants Clarke and Kelly participated in such retaliation." *Colon*, 2021 WL 2159758, at *1. The court granted Mark-Viverito's motion for summary judgment, dismissing Colon's aiding and abetting claim against her. *Id.* As of today, Colon's suit remains pending.

**III. The District Court's Analysis**

The district court began by assessing "in isolation" each of the five main sets of incidents that Williams asserted established a hostile work environment: 1) the July 30, 2015 meeting at Mark-Viverito's office; 2) Clarke's directions to

---

[3] Williams waived all claims against Kelly in her Memorandum in Opposition to the summary judgment motions.

18

Colon to transfer Williams from Mill Brook Houses; 3) the August 28, 2015 meeting regarding Williams's exchanges with Spanish-speaking residents at Mill Brook Houses; 4) NYCHA's failure to timely fill the HA vacancies; and 5) the transfer and replacement of Mill Brook's Spanish-speaking superintendent with Limo. *Williams*, 2021 WL 2077817, at *13.

As to the first incident, the district court reasoned that, "even if a reasonable trier of fact could find that Defendant Mark-Viverito asked for a 'Spanish Manager' at this meeting, this incident alone does not constitute sufficient basis for [Williams's] hostile work environment claims," principally because Mark-Viverito "had no role, management or otherwise, at NYCHA," never communicated with Williams outside of the July 30 meeting, and because Williams's belief that Mark-Viverito "wanted her replaced is mere conjecture." *Id*. at *14–15.

As for the second incident—Clarke's "aborted attempt to replace [Williams] as Manager of Mill Brook,"—the district court determined this too was insufficient to support a hostile work environment claim. *Id*. at *15. The district court observed that the attempt was unsuccessful, and there is no "indication that, during the period that Clarke was attempting to transfer

19

[Williams, her] work environment was adversely impacted in any way." *Id.* Moreover, the court noted, outside of Williams's "claim that Colon disclosed to her on an unspecified date that she was directed to transfer [Williams] for discriminatory reasons, the record is devoid of evidence of any incidents or correspondences that would have revealed to [Williams] that an effort to replace her as Mill Brook Manager was ongoing," and "[i]t is axiomatic that acts taken unbeknownst to a plaintiff cannot form the basis for a hostile work environment claim[]." *Id.*

As to the third incident—Clarke's allegedly aggressive statements to Williams during an August 28, 2015 meeting concerning Williams's communications with "Spanish residents" at Mill Brook—the district court concluded that although Williams had offered sufficient evidence to raise a triable issue of fact regarding what occurred during the meeting, Clarke's "demeanor and comments during this meeting alone [were] insufficient to establish a hostile work environment claim" because "hostile work environment claims are not appropriate venues for enforcing general workplace civility codes." *Id.* at *16. The fourth incident—concerning the HA vacancies—similarly failed, primarily because the "four HAs [who] were absent from work or

transferred out of Mill Brook during this period [did so] for unforeseen reasons largely unrelated to" Williams or Defendants and because Williams introduced no "evidence to show that such delays between vacancies and staffing were out of the ordinary, or that NYCHA offered other residential locations preferential treatment with regards to the speed of staffing or re-staffing." *Id.* Finally, the fifth incident—concerning the transfer of Martinez, the Spanish-speaking superintendent—could not alone constitute a hostile work environment claim, because even if Limo, the replacement superintendent, underperformed during the two weeks Limo and Williams worked together, Williams "fail[ed] to identify any evidence in the record that Limo's alleged underperformance materially altered [Williams's] conditions of employment." *Id.* at *18.

After analyzing each of the five central events in isolation, the district court considered the first three incidents "in their totality" and concluded that "these three incidents combined are also inadequate to support [Williams's] hostile work environment claims." *Id.* at *19. The court did not include the fourth and fifth incidents in its totality analysis after concluding that Williams had failed to "establish facts showing that [those] two events . . . are in any way connected to the other three alleged discriminatory events . . . or otherwise motivated by

21

discriminatory intent on the part of the NYCHA Defendants." *Id.* The court reasoned that the first three events did not alter Williams's employment and create an abusive working environment; specifically, it "strains credulity that the August 28, 2015 meeting and Clarke's unsuccessful attempt to have [Williams] transferred from Mill Brook somehow precipitated or had any connection whatsoever with [Williams's] retirement almost two years later." *Id.* The court dismissed the hostile work environment claims against the NYCHA Defendants and then dismissed the aiding and abetting claims against all Defendants, because "an aiding and abetting claim is only viable when an underlying violation has taken place." *Id.* at *20 (citing *Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009)).

Williams timely appealed.

## DISCUSSION

This appeal concerns hostile work environment claims under federal law against Clarke and Kelly for violating Sections 1981 and 1983 and the Equal Protection Clause; under state law against Clarke, Kelly, and NYCHA; and under city law against Clarke, Kelly, and NYCHA. This appeal also concerns state law

22

claims of aiding and abetting a hostile work environment against Mark-Viverito, NYCHA, Clarke, and Kelly.

Williams contends that the district court erred in granting Defendants' motions for summary judgment and in doing so, misapplied the totality of the circumstances standard established in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). We agree. We also conclude that the district court failed to draw "all reasonable inferences" in Williams's favor when it considered the five incidents underlying her claims, both when viewing the incidents individually and in their totality. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108 (2d Cir. 2013).

"We review de novo the district court's grant of summary judgment, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor." *Id.* "Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

23

## I.   Governing Law

To establish a hostile work environment claim under Sections 1981 and 1983, and the NYSHRL, a plaintiff must first produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local L. No. 85 (internal quotation marks omitted); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) ("The same standards apply to the plaintiffs' hostile [work] environment claims arising under the NYSHRL and to their claims arising under 42 U.S.C. § 1981." (internal citations omitted)). A hostile work environment is shown when "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted" to be deemed "pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal citation and quotation marks omitted). That analysis includes both an objective and a subjective component: "[a] work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Next, a plaintiff must show "a specific basis . . . for imputing the conduct that created the hostile work environment to the employer." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000). Still, an individual defendant may be held liable "only if that individual is personally involved in the alleged deprivation." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (internal citation and quotation marks omitted). In addition, "when a supervisor wields the authority delegated to him by an employer . . . the supervisor's conduct is deemed to be that of the employer, and the employer is liable for that conduct." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 152–53 (2d Cir. 1997).

A plaintiff alleging a hostile work environment has a lower burden under city law than under its federal or state counterparts. For a NYCHRL claim to survive summary judgment, the plaintiff need only show that her employer treated her "less well than other employees," at least in part for a discriminatory reason. *Mihalik*, 715 F.3d at 110 (internal quotation marks omitted). "The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes . . . that discrimination play[ed] *no* role in its actions." *Id.* at 110 n.8 (internal citation and quotation

marks omitted). "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages." *Id.* at 110. Nevertheless, "the NYCHRL is not a general civility code," and even if "the plaintiff establishes that she was treated less well because of her [protected characteristic], defendants may assert an affirmative defense whereby [they] can still avoid liability if . . . the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Id.* at 110–11 (internal quotation marks omitted).

## II. The Hostile Work Environment Claims

Williams contends that genuine disputes of material fact preclude summary judgment on her hostile work environment claims under Sections 1981 and 1983, the NYSHRL, and the NYCHRL. As an initial matter, although the premise of each of Williams's claims is the allegation that Defendants contributed to a hostile work environment, we must analyze the federal- and state-law claims separately from the city-law claims. *See Mihalik*, 715 F.3d at 109 (concluding that courts must "analyze NYCHRL claims separately and independently from any federal and state law claims" and construe its

26

provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (internal quotation marks omitted)).

**A. The Federal and State Law Hostile Work Environment Claims**

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment . . . ." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); *see also Whidbee*, 223 F.3d at 69 ("Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment.").

Section 1983 allows an action at law against a "person who, under color of [law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Although "not itself a source of substantive rights," *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979), Section 1983 "constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units," *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018)

27

(emphasis omitted) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). Through its application of the Equal Protection Clause of the Fourteenth Amendment, Section 1983 "protect[s] public employees from various forms of discrimination, including hostile work environment" claims based on race. *Littlejohn*, 795 F.3d at 320 (internal quotation marks omitted). Similarly, the NYSHRL makes it unlawful for an employer to discriminate, as relevant here, on the basis of "race, creed, color, [or] national origin." *See* N.Y. Exec. Law § 296. Hostile work environment claims under the NYSHRL are "governed by the same standards" as claims under federal law. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

The district court erred when it identified several triable issues of fact but concluded that a reasonable juror could not determine that the NYCHA Defendants subjected Williams to a hostile work environment. When looking at the five main incidents that gave rise to Williams's claims, the court categorized the first three as ones that "potentially reference race" and categorized the latter two as "facially neutral." *Williams*, 2021 WL 2077817, at *13. The court then individually addressed the three incidents that "potentially reference race"

28

before assessing the totality of those incidents, as part of its faulty totality of the circumstances analysis. *See id.* at *13–20.

Beginning with Mark-Viverito's comment at the July 2015 meeting that she wanted a "Spanish manager," the district court acknowledged that the record raises a triable issue of fact as to whether Mark-Viverito made the comment in question. *See id*. at *14. Mark-Viverito does not recall making the statement, "I want a Spanish Manager," and Clarke's testimony supports her denial. App'x at 464, 418–19. Clarke also testified that no one else at the meeting demanded Williams's transfer. *See* App'x at 418–19. Williams, however, testified that Mark-Viverito insisted Williams be replaced with a "Spanish manager," and Colon corroborated Williams's testimony. Colon also testified that after the meeting, she, Williams, and Artis discussed the "racist" incident, in which Mark-Viverito was "telling [them] that she want[ed] a Spanish manager." App'x at 770.

Apart from the conflicting accounts of whether Mark-Viverito uttered the "Spanish manager" demand, there is also a question as to whether such a statement, if made, was racially motivated. NYCHA argues that because the sole focus of the July 30 meeting was to discuss language-barrier issues at Mill Brook Houses, no rational juror could find that Mark-Viverito demanded NYCHA

29

replace Williams with a manager who was ethnically "Spanish" or that she made any demand with respect to the race or national origin of any individual. Appellee (NYCHA) Br. at 3. The district court concluded that Williams's subjective perception that Mark-Viverito's statement was "propelled by racial animus" was not controlling, as the term "Spanish Manager does not rise to the level of an epithet" or "explicitly reference [Williams's] race." *Williams*, 2021 WL 2077817, at *14–15.[4]

The district court also held that, since Mark-Viverito was not a NYCHA employee and because this isolated incident was the only time she interacted with Williams, her conduct could not be imputed to NYCHA. Drawing an analogy to situations where harassment is perpetrated by the plaintiff's coworkers, the district court found Mark-Viverito's conduct could only be imputed to NYCHA if the agency "knew of the harassment but did nothing about it." *See id*. at *14 (citing *Perry*, 115 F.3d at 152–53). It is undisputed that Williams's supervisor, Clarke, attended the July 30 meeting telephonically and

---

[4] As noted above, the record contains email communications between NYCHA employees suggesting that the purpose of the meeting was to assign a Spanish speaking housing assistant to Mill Brook Houses, not to replace Williams with an ethnically "Spanish" manager.

30

remained silent throughout the entire meeting, arguably doing nothing when, as we must assume at this stage, the comment was made. The details of this meeting are thus rife with genuine issues of fact, the type that are ripe for a jury's determination.

The district court next turned to the second event, Clarke's attempt to transfer Williams from her position at Mill Brook Houses and his reasons for doing so. The district court found it unnecessary to discern NYCHA's rationale for its attempts to transfer Williams because the attempted transfer, alone, was insufficient to raise a hostile work environment claim. *See id*. at *15. However, in Colon's companion case, with which discovery in this case was consolidated, the court concluded that a jury could find that Clarke's efforts to transfer Williams were motivated by unlawful discrimination. *See Colon*, 2021 WL 2159758, at *15. Thus, the court denied the same defendants summary judgment because "a reasonable person in [Colon's] position might believe that Clarke's attempt to transfer Williams for so-called 'cultural' reasons alone was a thinly veiled attempt to hide the discriminatory reason." *See id*. The court observed that Colon

> has raised sufficient facts that would allow a reasonable jury to infer
> that Human Resources hesitated and in fact did not approve of the
> transfer. As the record demonstrates, Williams's transfer was not

31

approved of by Human Resources, was delayed and ultimately abandoned—according to Clarke, "because it was recommended to me [by the Law Department] not to transfer at this time," (Clarke June 13, 2019 Dep. Tr. 146:7-8)—raising questions about the propriety of the request.

*Id.* at \*15 n.33. Moreover, "[g]iven Williams's lack of any apparent disciplinary history that could substantiate the claim that she was underperforming, Human Resources employees were leery of effectuating her transfer on 'cultural' reasons alone." *Id*. at \*15. Ultimately, the district court reasoned that "[t]hese impressions could certainly support an inference that race was a motivating factor in requesting the transfer that a trier of fact could reasonably make." *Id*. (citing *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253 (2d Cir. 2014) (holding that phrases such as "better fit or fitting in" may "have been about race" and at the summary judgment phase, when construing the facts in a light most favorable to the non-moving party, such phrases could create a reasonable question of fact for a jury) (internal quotation marks omitted)).

By contrast, the district court here denied Williams the benefit of this interpretation of events even though the record at summary judgment was materially similar to Colon's. Instead, the district court granted NYCHA summary judgment because "Clarke's aborted attempt to replace

32

[Williams] . . . did not come to fruition"; "during the period that Clarke was attempting to transfer [Williams, her] work environment was [not] adversely impacted in any way," and because Williams introduced no evidence that "she was aware of the NYCHA Defendants' attempt to remove her before Colon allegedly told" her—on an unspecified date—that she had been "directed to transfer [Williams] for discriminatory reasons." *Williams*, 2021 WL 2077817, at *15. What the court calls an "aborted attempt"—suggesting that Clarke himself stopped the effort—a jury could reasonably conclude was a stymied attempt, halted only because human resources employees repeatedly told Clarke and others it was illegal to make transfers on the basis of race, and the Law Department ultimately advised against the transfer. Another basis from which a jury could conclude that Clarke's motivation for the transfer was race-based can be gleaned from the fact that Clarke stopped pursuing the transfer after human resources told him it flowed from illegal motivation. If the transfer was based on Williams's performance, as Clarke claims, then it is odd that he stopped pursuing the transfer. Given that some NYCHA employees characterized the transfer as racially motivated, and the Law Department advised Clarke against the transfer, a jury could surely draw a reasonable inference to that effect.

33

The district court found that Williams did not know of the ongoing efforts to replace her based on Williams's failure to specify the date on which Colon told her of the transfer request. *Id*. But at summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw *all reasonable inferences in its favor.*" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (emphasis added). Even if Williams did not know at the time of the efforts to remove her, that fact alone would not be dispositive. *See, e.g.*, *Cruz*, 202 F.3d at 571 ("[E]ven if [the plaintiff] herself were not present or were not the target of some of [the] racial remarks, a jury plausibly could find that [the] persistently offensive conduct created an overall 'hostile or abusive environment,' . . . which exacerbated the effect of the harassment [the plaintiff] experienced individually." (quoting *Harris*, 510 U.S. at 21)); *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) ("Whether [the plaintiff] was aware of [harassment directed at others] during his employment, and, more significantly, whether in light of these incidents, the incidents [the plaintiff] experienced more directly would reasonably be perceived, and [were] perceived, as hostile or abusive, . . . are factual issues that should be resolved by a trier of fact." (internal quotation marks omitted)). In other words, a jury could reasonably find that the staffing

34

issues that followed the two racially disparaging meetings caused Williams to suffer a hostile work environment. Moreover, a jury could consider Clarke's racially motivated effort to transfer Williams as evidence that the staffing issues were indeed racially motivated.

The third incident the district court examined as "potentially referenc[ing] race" was the August 28, 2015 meeting, in which Clarke allegedly made aggressive statements regarding Williams's communications with "Spanish residents" at Mill Brook Houses. *See Williams*, 2021 WL 2077817, at \*14–16. Clarke maintains that he did not attend that meeting, nor did he ever ask Williams in any meeting how she "spoke to Spanish people." App'x at 693. But both Williams and Artis testified that Clarke was at the August 28 meeting. Williams stated, "it was just horrible the way that man spoke to me," App'x at 346, and "everyone was shocked at how [Clarke] spoke to me." App'x at 348. Artis acknowledged that "[Clarke] was kind of rough with her" and spoke to her "with contempt." App'x at 898. Williams testified that during the meeting Clarke asked her about the "Spanish speaking thing." App'x at 350. Despite finding that Williams proffered sufficient evidence to raise triable issues of fact regarding whether the meeting occurred and what was said, the court concluded that

35

Clarke's "demeanor and comments during [the] meeting [were] alone insufficient alone to establish a hostile work environment claim." *Williams*, 2021 WL 2077817, at *16.

This was error. Again, at summary judgment a district court must credit all factual inferences that could rationally be drawn in Williams's favor, and the court failed to do so. *See Allen*, 64 F.3d at 79. Despite acknowledging that Williams raised a triable issue as to whether the meeting took place, the district court failed to consider that there is also a question of material fact as to whether Clarke's demeanor and conduct, at a meeting he claims he did not attend, could establish a hostile work environment claim. Moreover, Clarke's testimony that he was not present at the meeting because he was "extremely busy" that day since it "was the day that Ms. Colon resigned," is contradicted by the testimony of Colon and others that she resigned from her position during the meeting at issue. App'x at 693; *see also* App'x at 351, 1065.

Later, in its totality analysis, the district court stated that "[i]t also strains credulity that the August 28, 2015 meeting and Clarke's unsuccessful attempt to have [Williams] transferred from Mill Brook somehow precipitated or had any connection whatsoever with [Williams's] retirement almost two years later." *See*

36

*Williams*, 2021 WL 2077817, at *19. Had the court drawn all inferences in Williams's favor, it would not have dismissed this potential link so readily. For example, though a jury might factor the nearly two-year gap against Williams, the jury could alternatively consider that the staffing shortages, which precipitated Williams's retirement, began in October 2015, roughly two months after the initial meeting with Mark-Viverito and about one month after the later meeting with Clarke. The court thus overlooked disputed material facts, supplanting the function of a jury.

### i. Totality of the Circumstances Analysis

In *Harris v. Forklift Systems, Inc.*, the Supreme Court established the principle that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including such factors as, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23. Courts are thus "cautioned to consider the totality of the circumstances, and to evaluate the 'quantity, frequency, and severity' of the incidents," and must consider those factors "'cumulatively,' so that we may 'obtain a realistic view of

the work environment.'" *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (internal citations omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). This Circuit's case law focuses its analysis on the frequency and severity of the conduct, as the other enumerated factors are "specific considerations within the severity inquiry." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009). But as the Supreme Court held in *Harris*, "no single factor is required." 510 U.S. at 23. These factors should "guide the factfinder in making . . . a factual, not a legal, determination." *Schiano*, 445 F.3d at 605.

Williams argues the district court failed to follow this guidance, impermissibly disaggregating the facts. Appellant's Br. at 21–29. By divorcing the facts from the full context, she argues, the district court, misapplied the *Harris* standard. *Id*. According to Williams, "the proper analysis is not whether each incident of harassment 'standing alone' is sufficient to sustain [her] hostile work environment claim, but whether—taken together—the reported incidents make out such a case." *Id*. at 23.

We disagree that a district court commits error per se by employing a two-pronged analysis as the lower court did here. The district court properly began

38

by analyzing each key event in isolation because "even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'" *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012) (internal quotation marks omitted); *see also Alfano*, 294 F.3d at 374 ("[E]ven a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."). Williams herself emphasized the toll that the single meeting with Mark-Viverito took on her—she worried that management would try to sabotage her work and set her up to fail to justify her termination and replacement.

The district court did not offend the *Harris* standard in assessing whether this incident—and the other incidents, individually—were "sufficiently severe" to establish a hostile work environment. *See Redd*, 678 F.3d at 175–76. Of course, it would have been error had the court omitted its totality of the circumstances analysis. *Williams*, 2021 WL 2077817, at *18–19. Because the court did not forgo a cumulative totality analysis, we disagree that merely employing a two-step analysis meant the court was wrong from the start.

We find, however, that the district court did err in the substance of its analysis. After examining each of the five incidents giving rise to Williams's

39

hostile work environment claims, the court concluded that Williams had proffered no evidence that the fourth and fifth incidents—the alleged failure to replace the HAs between late 2015 and 2016, and the replacement of the Spanish-speaking superintendent in 2017, respectively—were "in any way connected to the other three alleged discriminatory events of 2015 or otherwise motivated by discriminatory intent on the part of the NYCHA Defendants." *Id.* at *19.

Accordingly, the court only assessed whether the first three incidents combined were "inadequate to support [Williams's] hostile work environment claims." *Id.*; *see also id.* at *18 ("I will not consider [Williams's] claim that the NYCHA Defendants failed to timely fill Mill Brook HA vacancies as part of my analysis of whether, under a totality of the circumstances, a claim for a hostile work environment lies."); *id.* ("Since [Williams] failed to identify any evidence of untoward conduct by [Defendants] with respect to [superintendent] Martinez's transfer, or a factual basis for any link between the transfer and the alleged discriminatory events, I decline to consider this event as part of [Williams's] hostile work environment claims . . . .").

The district court misapplied the *Harris* test by completely excluding the fourth and fifth incidents from its totality analysis. This analysis is intended to

provide courts with "a realistic view of the work environment." *Richardson*, 180 F.3d at 437 (internal quotation marks omitted). Since Williams's evidence reasonably suggests an orchestrated effort to remove her from her position at Mill Brook Houses, these other two events are a substantial part of her story. In *Schwapp*, this Court held that a lower court erred when it only considered four of twelve incidents of racial discrimination, having reasoned that only the first four events occurred in the plaintiff's presence and were thus relevant. *See* 118 F.3d at 111. Like the plaintiff in *Schwapp*, Williams claims that the fourth and fifth events adversely affected her work environment in the period leading up to her resignation. The district court similarly failed to consider the totality of the circumstances in its refusal to factor the other two events into its analysis.

None of this is to say that Williams is entitled to judgment in her favor. A jury could conclude that Mark-Viverito's reference to a "Spanish manager," if indeed she used the term, referred to language abilities, not ethnicity, and thus did not represent a "covert basis for national origin discrimination." *Cf. Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009) (quoting *Garcia v. Gloor*, 618 F.2d 264, 270 (5th Cir. 1980)). So too could a jury find that, even if the phrase was uttered and referred adversely to Williams's ethnicity, it was nothing

41

more than an "isolated incident[] of racial enmity" that could not "reasonably be perceived . . . as hostile or abusive," *Schwapp*, 118 F.3d at 110 (internal quotation marks omitted), borne more out of Mark-Viverito's frustration with Williams's alleged belittlement of Mill Brook Houses' Spanish-speaking residents than from any pervasive discrimination. Even if a jury concluded the incidents were as demeaning by themselves as Williams suggests, it could still find that the incidents did not rise to such a level as to "alter the conditions of [Williams's] employment and create an abusive working environment." *Rivera*, 743 F.3d at 20 (internal quotation marks omitted).

Alternatively, a jury could plausibly find that Mark-Viverito and the NYCHA Defendants engaged in a campaign to remove Williams from her position at Mill Brook Houses on account of race. The evidence would permit a reasonable jury to find, among other things, 1) that Mark-Viverito demanded that Williams be replaced with a "Spanish manager;" 2) that Clarke attempted to carry out Mark-Viverito's demand but failed after human resources and the Law Department stymied his efforts; and 3) that staffing issues at Mill Brook Houses began shortly after Clarke's failed attempts at transferring Williams, continuing up until her resignation.

42

The district court held that Williams did not demonstrate the effort to replace her tangibly impacted her work environment, bearing in mind that all a plaintiff must show is that the harassment "altered working conditions as to make it more difficult to do the job." *See Schiano*, 445 F.3d at 607 (internal quotation marks omitted). But a jury could find that the delay in filling the HA vacancies and the transfer of Mill Brook Houses' Spanish-speaking superintendent, along with the behind-the-scenes effort to transfer Williams, made it more challenging for Williams to carry out her job.

Regardless, these are determinations for the jury, not the judge, to make. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [the judge] is ruling on a motion for summary judgment or for a directed verdict."). "An Article III judge is not a hierophant of social graces" and is no better suited than a jury to decide if conduct rises to the level of a hostile work environment. *See Schiano*, 445 F.3d at 605 (citation and internal quotations omitted).

Resolving all ambiguities and drawing all inferences in Williams's favor, we cannot say as a matter of law that these incidents could not amount to a claim

of a hostile work environment under federal and state law. Williams raised several triable issues of material fact and as such, summary judgment was inappropriate.

**B.  The City Law Hostile Work Environment Claims**

Once a federal court exercises pendent jurisdiction over claims under the NYCHRL, as the district court did here, the court must "undertak[e] [an] independent analysis required by" city law. *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015); *see also Mihalik*, 715 F.3d at 109 (explaining that a district court must "separately and independently" analyze claims under the NYCHRL). Though the district court acknowledged that requirement, *see Williams*, 2021 WL 2077817, at *12, it arguably did not address the separate force of the NYCHRL.

We need not resolve that question, however. In light of our holding that Williams raised triable issues of material fact regarding her hostile work environment claims under federal and state law, it follows that she has done the same under the NYCHRL's more lenient standard. *See Mihalik*, 715 F.3d at 109 (explaining that federal and state law operate "as a floor below which the City's Human Rights law cannot fall" (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582

44

F.3d 268, 278 (2d Cir. 2009))). We therefore vacate the district court's grant of summary judgment on the NYCHRL claim.

### C. The State-Law Aiding and Abetting Claims Against Mark-Viverito and Clarke

Williams argues that each defendant aided and abetted the creation of a hostile work environment, in violation of state and city law. *See* N.Y. Exec. L. § 296(6) (making it "an unlawful discriminatory practice [under state law] for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so"); N.Y.C. Admin. Code § 8-107(6) (prohibiting the same conduct under city law). When evaluating aiding and abetting claims under the NYSHRL, the same standards apply to claims under the NYCHRL because "the language of the two laws is virtually identical." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (internal quotation marks omitted).

The district court concluded that because there was no underlying NYSHRL or NYCHRL violation, Defendants could not aid or abet any acts prohibited by these two statutes. *See Williams*, 2021 WL 2077817, at *20. On appeal, Williams objects only to the court's dismissal of her state-law aiding and

abetting claims against Mark-Viverito and Clarke. Because the court did not analyze whether, had the underlying NYSHRL claims survived, the aiding and abetting claims could as well, we vacate the lower court's dismissal of the NYSHRL aiding and abetting claim and remand for the district court's reassessment.

## CONCLUSION

For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.